Howard B. HILLMAN, in his individual capacity, in his capacity as a limited partner of the Venhill Limited Partnership, in his capacity as a Manager of HMC, LLC and on behalf of the Venhill Limited Partnership, and HMC Enterprises, LLC, a limited liability company, Plaintiff,

v.

Tatnall L. HILLMAN, Joseph J. Hill, Trust Under Agreement of Dora B. Hillman Dated August 25, 1968 f/b/o Howard B. Hillman, Trust Under Agreement of Dora B. Hillman Dated August 25, 1968 f/b/o Tatnall L. Hillman, Venhill Limited Partnership and William J. Stallkamp, Defendants.

C.A. No. 1557–N.

Court of Chancery of Delaware,
New Castle County.

Submitted: June 20, 2006.
Decided: Aug. 23, 2006.
Revised: Nov. 16, 2006.

---

**46.** *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del.1996).

**47.** *Id.*

**48.** *Id.* (quoting *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994)).

**49.** *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

John G. Harris, Reed Smith, L.L.P., Wilmington, DE, for Plaintiff.

Steven T. Davis, Obermayer Rebmann Maxwell & Hippel, L.L.P., Wilmington, DE; E. Parry Warner, Obermayer Rebmann Maxwell & Hippel, L.L.P., Philadelphia, PA, for Defendants Tatnall L. Hillman and Joseph J. Hill.

William M. Kelleher, Ballard Spahr Andrews & Ingersoll, L.L.P., Wilmington, DE; Roger P. Thomasch, K. Allison White, Ballard Spahr Andrews & Ingersoll, L.L.P., Denver, CO, for Defendant William J. Stallkamp.

## OPINION

STRINE, Vice Chancellor.

In this opinion, I address a motion by the limited partners, and the new general partner, of a Delaware limited partnership to dismiss a complaint filed by the former general partner who seeks to maintain an interest, as a limited partner, in the partnership, the Venhill Limited Partnership. In his amended complaint, the former general partner, Howard B. Hillman, seeks a declaration that he converted his 1% interest in Venhill into a limited partner interest when he was removed from his position as general partner by the trustees, Tatnall L. Hillman and Joseph J. Hill, of Venhill's limited partners, the Trust Under Agreement of Dora B. Hillman Dated August 25, 2968 F/B/O Howard B. Hillman (the "A-1 Trust") and the Trust Under Agreement of Dora B. Hillman Dated August 25, 1968 F/B/O Tatnall L. Hillman (the "B-1 Trust"), which each hold 49.5% of Venhill's partnership interests. For the sake of simplicity, I refer to Tatnall Hillman and Hill, who are the trustees of the undisputed limited partners, simply as the "Limited Partners," except when greater nuance is necessary. In addition to seeking a declaration that he also became a limited partner, Howard attempts to plead several claims against the Limited Partners and new general partner, William J. Stallkamp, which charge them with breaching their fiduciary and contractual duties to Venhill.

The Limited Partners and Stallkamp have moved to dismiss all counts of the amended complaint because they assert that Howard did not have the contractual right to convert his former general partnership interest in Venhill into a limited partnership interest when he was removed as general partner. Therefore, they argue that he does not have standing under the Certificate and Agreement of Limited Partnership of Venhill Limited Partnership (the "Limited Partnership Agreement") to bring contractual claims, and he is not owed any fiduciary duties because he is not a limited partner.

In this opinion, I grant the motion to dismiss. By the plain terms of the Limited Partnership Agreement, upon his removal as general partner, Howard was deprived of any option to become a limited partner. Because he was no longer a partner of any kind, Howard lacks standing to complain of actions taken by the new general partner and the Limited Partners af-

ter his removal. Howard's removal, however, does not work a forfeiture of his 1% capital contribution. Rather, drawing on the default principles in Delaware's general partnership statutes that apply because there is no guidance on this issue in the Limited Partnership Agreement and no binding provision of the Delaware Revised Uniform Limited Partnership Act (the "DRULPA"), I conclude that Howard is entitled to the fair value of his partnership interest at the time of his removal.

## I. *Factual Background*

The following facts are drawn from Howard's amended complaint.

Venhill was formed in 1984. Venhill's purpose is "the acquisition, ownership, investment in, and disposition of personal and/or real property of all kinds, including but not limited to providing capital to corporations, partnerships, and joint ventures...."[1] That is, Venhill is an investment partnership rather than an operating partnership.

The Venhill Limited Partnership Agreement named Howard as the general partner, who was charged with "the management and control of the Partnership and its business and affairs."[2] Howard contributed 1% of Venhill's initial capital. The remaining capital was contributed by the A–1 Trust and the B–1 Trust, as the limited partners. Each Trust contributed 49.5% of Venhill's initial capital. At all relevant times, the A–1 and B–1 Trusts each had the same three trustees, Tatnall Hillman, Howard Hillman, and Joseph Hill. As the names of the trustees suggest, they were not strangers to each other.

Howard and Tatnall are brothers, and Hill is their cousin.

Shortly after Venhill was formed, Howard began another business undertaking. In 1985, he became the Chairman, President, and CEO of Auto-trol Technology Corporation. Auto-trol is a Colorado corporation that Howard contends is "a major international developer and integrator of documentation, information, process, and network asset management software for manufacturing, governments, and other contemporary businesses."[3] Apparently, Howard, as general partner, directed a meaningful portion of Venhill's investment funds in the direction of Auto-trol, the other company he ran.

In the late 1990s, the Limited Partners began to express their dissatisfaction with Howard's continuing investments in Auto-trol. Howard, though, took the view that "Auto-trol was on the brink of reaping the very benefits it is now experiencing and that a cessation of investments would render Venhill's prior investments in Auto-trol worthless."[4] This discord simmered for several years until it finally boiled over in 2005.

### A. *Howard Moves The Shares Of Auto-trol Owned By Venhill Into A Shell LLC*

In January 2005, Howard decided that the unhappy Limited Partners were a threat to Auto-trol, and, therefore, to Venhill itself. In order to protect Venhill (or more likely Auto-trol) from the Limited Partners, Howard formed a Delaware limited liability company, HMC Enterprises, LLC, to which he transferred Venhill's 566,581 shares of Auto-trol common stock.[5]

---

1. Ltd. P'ship Agmt. ("LPA") Art. IV.

2. *Id.* § 9–1.

3. Am. Compl. ¶ 32.

4. *Id.* at ¶ 51.

5. *Id.* at ¶ 53.

The Agreement of Limited Liability Company of HMC Enterprises, LLC (the "LLC Agreement") lists Venhill as the sole member of HMC, and it names Howard as the "single person ... who shall have all powers to control and manage the business and affairs of" HMC.[6] Howard went even further to protect his role at HMC by, essentially, rendering Venhill impotent to remove him.

The HMC LLC Agreement provides that Howard shall remain as the manager of HMC until:

> (i) his death, (ii) his resignation by written instrument delivered to the Member or (iii) his removal by written instrument signed by the Member and delivered to the Manager; *provided, however,* the Member shall not remove the Manager by written instrument as set forth in (iii) immediately above prior to the issuance of a non-appealable judicial determination by a court of competent jurisdiction expressly stating that the Manager acted with gross negligence or willful misconduct in performance of his duties as the Manager; *and further provided,* that upon the death of the Manager, his estate shall automatically be elected and qualified as successor Manager to serve in such capacity until the occurrence of an event listed in (ii) or (iii). . . . [7]

The effect of the HMC LLC Agreement, then, was to place Venhill's Auto-trol stock under the control of HMC and place HMC under the control of Howard until he quits, dies (and even then control passes to his estate), or a court issues a non-appealable ruling that he acted with gross negligence or willful misconduct and Venhill then re-

moves him. Howard further acted (he says) to protect Auto-trol, and Venhill, by explicitly stating that Venhill "shall not have any right or power to take part in the management or control of the LLC or its business and affairs or to act for or bind the LLC in any way," and Venhill also has "no voting rights. . . ." [8]

According to the Limited Partners, Howard failed to mention to them that he moved Venhill's shares of Auto-trol to HMC. By early 2005, Venhill had invested nearly $30 million in Auto-trol and loaned it approximately $50 million. Howard and the Limited Partners, then, were still involved in a dispute regarding Venhill's continued investments in Auto-trol, and the Limited Partners were unaware that HMC existed or that the Auto-trol stock was no longer under the control of Venhill. In March 2005, Howard offered the Limited Partners "the opportunity to receive preferred stock in Auto-trol in the hopes of resolving their dispute." [9] The Limited Partners already feared Auto-trol had become a worthless investment, and they declined that offer of compromise.

### B. The Limited Partners Remove Howard As General Partner Of Venhill, And Howard Attempts To Convert His 1% Interest Into A Limited Partner Interest

Having failed to resolve their dispute with Howard, the Limited Partners took action by unanimous consent on July 26, 2005 to remove Howard as general partner of Venhill pursuant to § 15.2 of the Limited Partnership Agreement.[10] That section provides, quite succinctly, that "[t]he General Partner may be removed as a General Partner at any time upon the unanimous

---

6. *Id.* at Ex. B, § 9(a).

7. *Id.*

8. Am. Compl. at Ex. B, § 9(b).

9. *Id.* at ¶ 56.

10. *Id.* at Ex. C.

written consent of all Limited Partners." In that same unanimous consent, the Limited Partners appointed defendant Stallkamp as the new general partner of Venhill. Howard alleges that Stallkamp was appointed as a straw man, and that his appointment was conditional upon him agreeing to distribute Venhill's assets to the Limited Partners.[11]

Shortly after his removal as general partner, on August 9, 2005, Howard attempted to convert his interest in Venhill into a limited partnership interest pursuant to §§ 10.2 and 15.3 of the Limited Partnership Agreement. Section 15.3 provides conditions under which a former general partner may elect to become a limited partner. It states:

> In the event that the General Partner shall retire pursuant to Section 15.1 or be removed as a result of the dissolution where the Partnership is continued pursuant to Section 11.2, he shall continue to be entitled to receive all of the Partnership net revenue, income or gain and, upon the dissolution and termination of the Partnership, the share of the assets of the Partnership, which such General Partner is entitled to receive under the terms of this Agreement. At the election of such General Partner or his representatives, such General Partner or his estate may become a Limited Partner upon compliance with Section 10.2 and his Capital Contributions shall be restated as Units for the purpose of determining his share of allocations and distributions pursuant to Article VIII.

Thus, § 15.3 permits a general partner who retires or who is removed by dissolution under § 11.2 either: i) to continue to receive the economic benefits flowing from Venhill or ii) to elect to become a limited partner after complying with § 10.2. Section 10.2 provides:

> If the General Partner consents to the admission of a person as a substituted Limited Partner within the meaning of the Act, and if such person
> (a) Elects to become a substituted Limited Partner by delivering written notice of such election to the General Partner;
> (b) Executes and acknowledges such other instruments as the General Partner may deem necessary or advisable to effect the admission of such person as a substituted Limited Partner, including without limitation the written acceptance and adoption by such person of the provisions of this Agreement; and
> (c) Pays a transfer fee to the Partnership . . .
> the Agreement shall be amended in accordance with the provisions of the Act; all other steps shall be taken which, in the opinion of the General Partner, are reasonably necessary to admit such Person . . . and such person shall thereupon become a substituted Limited Partner within the meaning of the Act.

The thrust of § 10.2, then, is that Venhill's general partner must consent to the admission of a substitute limited partner, and that the substitute limited partner must satisfy certain procedural requirements for admission, such as accepting the terms of the Limited Partnership Agreement and paying a transfer fee to Venhill. Howard alleges that he complied with the terms of §§ 15.3 and 10.2 and that, as of August 9, 2005, he became a limited partner of Venhill.

### C. Howard's Claims Against The Limited Partners And New General Partner

In his complaint, Howard challenges conduct by the Limited Partners and

---

11. *Id.* at ¶ 62.

Stallkamp that occurred entirely after his removal. That conduct, as he alleges it, is as follows.

After removing Howard as the general partner, the Limited Partners voted to approve a service agreement with Stallkamp, the new general partner (the "Service Agreement"), which Howard alleges was contrary to the Limited Partnership Agreement in two ways. First, the Service Agreement permitted any two Venhill limited partners to remove Stallkamp, while the Limited Partnership Agreement required unanimous consent under § 15.2. Second, the Service Agreement permits Stallkamp to receive compensation for his service as general partner, although § 7.1 of the Limited Partnership Agreement states that the general partner would receive no compensation. That is, Howard alleges that he is a limited partner but that the Service Agreement allowed Stallkamp to be accountable only to the A–1 and B–1 Trusts, who owned 99% of the units, because they could remove Stallkamp without consulting Howard. His final allegation is that, after Stallkamp was appointed general partner, Stallkamp turned over the reins of Venhill to the Limited Partners, which he was not permitted to do, and that the Limited Partners involved themselves in the business of Venhill, which § 6.4 of the Limited Partnership Agreement did not permit them to do.

Howard, then, requests this court to declare that he successfully elected to become a limited partner, that the Limited Partners inappropriately amended the Limited Partnership Agreement after July 26, 2005, that the Limited Partners violated their contractual duties by taking part in Venhill's business, and that the Limited Partners and Stallkamp breached fiduciary duties owed to Venhill and to him.

## II. *Procedural Framework*

The briefs, and amended complaint, raise several issues.[12] But, there are two decisive issues. The first, and central, question is whether the Limited Partnership Agreement permitted Howard to elect, after being removed, to become a limited partner. If Howard correctly interpreted the Limited Partnership Agreement and became a limited partner, then the Limited Partners have advanced no independent basis to dismiss the remaining claims against them.[13] If Howard failed to become a limited partner, though, the issue becomes more muddied, and another key question arises.

The second question, then, is if Howard is not a limited partner, what is he? If the plain language of the Limited Partnership Agreement flatly contradicts Howard's attempt to state a claim that he is a limited partner of Venhill, the question of how to classify Howard's capital contribution to Venhill remains. Given the silence of the Limited Partnership Agreement, the default provisions of the relevant Delaware partnership statutes are left to fill the void.

12. Howard's complaint states seven counts: Count I for declaratory judgment that he is a limited partner; Count II for a declaration that his transfer of Auto-trol stock to HMC was proper (this count was voluntarily dismissed by Howard); Count III for a declaration that the Limited Partners have improperly amended the Limited Partnership Agreement; Count IV for breach of contract against the Limited Partners; Count V for breach of fiduciary duties against the Limited Partners; Count VI for breach of fiduciary duties against Stallkamp; and Count VII for aiding and abetting a breach of fiduciary duties against the Limited Partners.

13. Stallkamp, though, argues an independent basis, contractual authority, as an additional ground for dismissing the remaining claim against him.

I address those questions applying the familiar procedural framework of Rule 12(b)(6). In examining a Rule 12(b)(6) motion, this court must accept the well-pled factual allegations in the complaint as true and draw reasonable inferences from them in the plaintiff's favor.[14] But the court need not accept as true conclusory allegations without specific facts alleged to support the conclusion.[15] Also, in certain circumstances, the court may consider the plain terms of documents incorporated in the complaint without thereby converting the motion into one for summary judgment.[16] In that instance, "a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations."[17]

In this case, Howard's complaint incorporated the Venhill Limited Partnership Agreement, the HMC LLC Agreement, and the Unanimous Written Consent that removed him as general partner, all of which are integral to his complaint. Therefore, I will consider the plain terms of those documents in determining whether Howard has stated a claim under Rule 12(b)(6).

## III. *Legal Analysis*

A. *Did Howard Have The Contractual Ability To Become A Limited Partner After His Removal As General Partner?*

Howard, as discussed, contends that §§ 10.2 and 15.3 of the Limited Part-

nership Agreement permitted him to convert his capital contribution into a limited partnership interest. His reading of those provisions, though, clearly contradicts their plain language. Those sections, 10.2 and 15.3, define a limited right of a general partner, in certain instances, to convert his interest into a limited partnership interest.

Section 15.3 addresses the rights of a general partner who either: 1) retires pursuant to § 15.1; or 2) is removed as a result of the dissolution where the Partnership is continued pursuant to § 11.2. The remainder of § 15.3 provides that "such General Partner" may "become a Limited Partner upon compliance with Section 10.2." That is, "such General Partner" refers back to the general partner who either retires or is removed as a result of dissolution. The problem for Howard, then, is that he was removed pursuant to § 15.2, and a general partner removed pursuant to § 15.2 is not provided with right to elect to become a limited partner under § 15.3.

To combat the clear language of § 15.3, Howard purports to proffer another reasonable interpretation of § 15.3, but that interpretation is strained and untenable. Howard's supposedly "reasonable" interpretation is that the phrase "such General Partner" does not refer back to the description of the general partner at the beginning of § 15.3. But it plainly does. At oral argument, presumably recognizing the deficiency of his prior argument, How-

14. *E.g., Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896 (Del.2002); *Solomon v. Pathe Commc'ns Corp.,* 672 A.2d 35, 38 (Del.1996).

15. *E.g., In re General Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006) (citing *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 65–66 (Del.1995)).

16. *E.g., In re General Motors,* 897 A.2d at 169; *In re Santa Fe,* 669 A.2d at 69; *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 727 (Del. Ch.1999); *Sanders v. Devine,* 1997 WL 599539, at *4 (Del.Ch. Sept. 24, 1997).

17. *H–M Wexford, LLC v. Encorp, Inc.,* 832 A.2d 129, 139 (Del.Ch.2003).

ard posited that, despite its clear terms, § 15.3 was somehow meant to provide a former general partner with the option to become a limited partner under any circumstance in which the former general partner left that role but the partnership continued. Howard premises that textually-unsupported argument on the further hopeful and extra-contractual assumption that the founders of Venhill did not contemplate Venhill continuing after removal of a general partner under § 15.2. These are Howard's wishes as to what the Venhill Limited Partnership Agreement might have said but, in fact, did not say.

This court has stated, on numerous occasions, that "[w]hen a contract is unambiguous in its language, the Court will not proceed to interpret it or to search for the parties' intent behind the plain language employed."[18] The court, of course, must construe the document as a whole.[19] Construing § 15.3 in the context of the entire Limited Partnership Agreement, though, poses no problems for a plain reading of its clear language.

The Limited Partnership Agreement contains three provisions addressing situations resulting in the departure of a general partner from that status: 1) § 11.2, which addresses the situation when a § 11.1(a) event (described below) occurs to the existing general partner that would otherwise cause that general partner's removal and a dissolution of Venhill but does not result in dissolution because the limited partners elect to continue the business with a new general partner; 2) § 15.2, which permits the limited partners to remove the general partner by a unanimous written consent at any time; and 3) § 15.1, which deals with the procedure for a general partner to retire. These are contractually distinct provisions, which address different circumstances and which must be given independent effect. The Limited Partnership Agreement, in § 15.3, provides for the departed general partner to elect to become a limited partner under only two of the three circumstances just mentioned: retirement pursuant to § 15.1 or removal as a result of an event covered by § 11.2. It would be an odd error for the drafters to have missed the possibility of a removal under § 15.2 when drafting the very next section of the Agreement, § 15.3.

The dichotomy created by the drafters of the Venhill Limited Partnership Agreement is entirely reasonable and makes business sense; in other words, giving effect to the plain language of the contract creates no absurd result.[20] That Agreement allows a general partner who either leaves voluntarily, through retirement, or under the terms of § 11.2, which is triggered upon a dissolution under § 11.1(a) that occurs upon the "death, mental illness, bankruptcy or retirement of the General Partner," to elect to become a limited partner. In contrast, a general partner who is ousted involuntarily for some reason by the limited partners does not get that privilege under § 15.3.

Given that Howard's complaint pleads that he became a limited partner under §§ 10.2 and 15.3, his request for a declaratory judgment to that effect must be dis-

18. *Mehiel v. Solo Cup Co.*, 2005 WL 1252348, at *5 (Del.Ch. May 13, 2005). *See Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343 (Del. 1983).

19. *See E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del.1985); *Ka-*

*tell v. Morgan Stanley Group*, 1993 WL 205033, at *5 (Del.Ch. June 8, 1993).

20. *E.g., State v. Cooper*, 575 A.2d 1074, 1076 (Del.1990) (stating that literal interpretations of statutory language that yielded absurd results should be avoided).

missed for failure to state a claim.[21] The clear language of § 15.3 directly contradicts his claim that he was entitled to convert his capital contribution into a limited partnership interest. Therefore, Count I is dismissed.

### B. What Rights Does Howard Possess After His Removal?

■ Howard advances an alternative argument as to why he must be permitted to become a limited partner. Namely, Howard claims that unless he is granted limited partner status, his 1% interest in Venhill will be forfeited—a result Delaware law tends to disfavor.[22] The problem for Howard's alternative argument is that his inability to become a limited partner does not work a forfeiture. In fact, the Limited Partners have recognized, both in their briefing and at oral argument, that Howard will be entitled to some equitable return of his 1% interest. They merely contend that any entitlement to a return of his contribution must await the outcome of pending litigation in which the Limited Partners claim that Howard breached his fiduciary duties to Venhill by siphoning Venhill's Auto-trol assets off to HMC. The interesting issue is the precise contours of Howard's right to recompense for his 1% interest. I address that now.

The Limited Partnership Agreement indisputably is silent about what becomes of a capital contribution that does not constitute a partnership interest. The provision governing wind-up provides for distributions first to non-partner creditors, next to partner creditors, and finally to the general partner and holders of units.[23] That is, a contributor of equity, not debt, who does not own partnership units is not addressed in the wind-up provision. In the event that a limited partnership agreement is silent, the DRULPA provides the initial fall-back or default provisions.[24]

For the sake of clarity and context, it is useful to note that the DRULPA was drawn, initially, from the 1976 Revised Uniform Limited Partnership Act, and in its current form is drawn from the 1985 version of the Revised Uniform Limited Partnership Act (the "RULPA"), and its sections generally track the corresponding section of the 1985 RULPA (e.g., § 17–702 of the DRULPA is § 702 of the 1985 RULPA). Notably, the 1985 RULPA was amended in 2001 in a manner that addresses the residual ambiguity at issue here that remains in the DRULPA.[25] My ref-

21. Because the clear and unambiguous language of § 15.3 did not provide Howard with the right to convert his interest, I need not address whether Howard complied with the terms of § 10.2 and whether, under that section, Stallkamp was required to consent to Howard becoming a limited partner.

22. E.g., Clements v. Castle Mortgage Serv. Co., 382 A.2d 1367, 1370 (Del.Ch.1977); Garrett v. Brown, 1986 WL 6708, at *8–9 (Del.Ch. June 13, 1986); Milford Power Co., LLC v. PDC Milford Power, LLC, 866 A.2d 738, 762 (Del. Ch.2004).

23. LPA § 11.3.

24. E.g., Cantor Fitzgerald, L.P. v. Cantor, 2001 WL 1456494, at *5 (Del.Ch. Nov. 5, 2001).

25. See Unif. Ltd. P'ship Act §§ 603, 605 (2001) (hereinafter, "Re–RULPA"). Commentary on Re–RULPA, though, acknowledged that it was unclear under the 1985 RULPA whether dissociation by a general partner through means other than a voluntary withdrawal under § 602 of RULPA entitled the disassociating partner to receive the fair value of its partnership interest under § 604 of RULPA. ALAN R. BROMBERG AND LARRY E. RIBSTEIN, BROMBERG AND RIBSTEIN ON LIMITED LIABILITY PARTNERSHIPS, THE REVISED UNIFORM PARTNERSHIP ACT, AND THE UNIFORM LIMITED PARTNERSHIP ACT (2001) § 9.603 at 473 (2003 ed.) (citing Larry E. Ribstein, Linking Statutory Forms, 58 LAW & CONTEMP. PROBS. 187, 194–195 (1995)).

erences to the RULPA are therefore to the prior "1985 RULPA" and to commentary about it. In discussing the DRULPA in this section, I therefore will use our statutory numbering system that includes the "17–", and the reader can assume that the DRULPA numerical sections referenced after the "17–" track the corresponding RULPA sections in substance unless otherwise noted.

The DRULPA provides that an "event of withdrawal" occurs and a person "ceases to be a general partner of a limited partnership" upon removal of the general partner "in accordance with the partnership agreement." [26] Here, the Limited Partners complied with § 15.2 of the Limited Partnership Agreement when removing Howard, and his removal, then, constituted an "event of withdrawal" under § 17–402(a)(3) of the DRULPA.

■ The next step in the statutory analysis involves the question of whether, because Howard's removal was an "event of withdrawal," Howard became a "withdrawing partner" under another section of the DRULPA, § 17–604. That question, as we will see next, is not as easy to answer as it might appear.[27] Stated differently, while it might seem at first blush natural to treat every DRULPA-wide "event of withdrawal" as creating a "withdrawing partner" under § 17–604, there are arguments against such an identity of meaning. To understand why, I begin by describing the key aspects of three closely related provisions of the DRULPA— §§ 17–602, 17–603, and 17–604.

Working backwards a bit, § 17–604 addresses return of a withdrawing partner's interest, is titled "Distribution upon withdrawal," and provides that:

Except as provided in this subchapter, *upon withdrawal any withdrawing partner* is entitled to receive any distribution to which such partner is entitled under a partnership agreement and, if not otherwise provided in a partnership agreement, such partner *is entitled to receive, within a reasonable time after withdrawal, the fair value of such partner's partnership interest in the limited partnership as of the date of withdrawal* based upon such partner's right to share in distributions from the limited partnership.[28]

Section 17–602 addresses withdrawals of general partners. It provides that a "general partner may withdraw from a limited partnership at the time or upon the happening of events specified in the partnership agreement and in accordance with the partnership agreement," but also that "a partnership agreement may provide that a general partner may not assign a partnership interest in a limited partnership prior to the dissolution and winding up of the limited partnership." Section 17–603 addresses the instances when limited partners may withdraw from partnerships. Common to both §§ 17–602 and 17–603 is that the way they use the term "withdrawing partner" implies a context in which there has been a voluntary decision of a partner simply to exit.

Section 17–402 of the DRULPA identifies all "events of withdrawal," which in-

---

**26.** 6 *Del. C.* § 17–402(a)(3).

**27.** *See* J. WILLIAM CALLISON & MAUREEN A. SULLIVAN, PARTNERSHIP LAW AND PRACTICE: GENERAL AND LIMITED PARTNERSHIPS § 20:10 (2005) ("[1985 RULPA] provisions concerning the status of a partner who was a general partner prior to an event of withdrawal are muddled and need

legislative revision. First, [1985] RULPA provides a method for handling the interest of a general partner who *withdraws* from the limited partnership, but does not address other *events of withdrawal* by a general partner.").

**28.** Emphasis added.

clude more than a voluntary decision simply to depart as a partner. That is, § 17–402 provides the "events of withdrawal" for the entire DRULPA. These include situations when a general partner assigns away its entire interest, suffers death or becomes incompetent, or declares bankruptcy.

No case law exists deciding the question of whether every "event of withdrawal" in § 17–402 creates a "withdrawing partner" under § 17–604. The leading commentators on the DRULPA discuss the question but not in great depth. LUBAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS narrowly interprets § 17–604 as applying only to a "withdrawn partner" under §§ 17–602 and 17–603. That treatise states:

Section 17–604 only specifically applies to a partner's "withdrawal" from a limited partnership. There is some uncertainty whether a "withdrawal" under Section 17–604 covers a partner who ceases to be a partner for a reason other than voluntary withdrawal. The authors believe that Section 17–604 only applies

when a partner ceases to be a partner as a result of a voluntary withdrawal. Thus, absent a provision in a partnership agreement, Section 17–604 does not provide that a general partner would be entitled to the fair value of its interest upon its removal, bankruptcy, death or dissolution.[29]

But another leading Delaware treatise appears to take the opposite view on the breadth of § 17–604. FOLK ON THE DELAWARE GENERAL CORPORATION LAW states that:

If the partnership agreement does not provide otherwise, a partner *who ceases to be a partner* is entitled to receive within a reasonable time the fair value of such partner's interest in the limited partnership as of the date the partner ceased to be a partner.[30]

FOLK, then, seems to suggests a broad view of § 17–604, which indicates that any partner that ceases to be a partner, not just a withdrawing partner under §§ 17–602 and 17–603, is entitled to the return of fair value for his interest upon withdrawal.[31] I

---

**29.** MARTIN I. LUBAROFF & PAUL M. ALTMAN, LUBAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS § 6.7 at 6–14 (2000 Suppl.). The LUBAROFF & ALTMAN view is echoed by a treatise on the 1985 RULPA. That treatise reasons that:

RULPA § 604 deals with payment to a withdrawing partner, and RULPA § 402(2) states that one of the events of withdrawal, upon which a general partner ceases to be a general partner, is a withdrawal under RULPA § 602. Therefore, the best statutory interpretation is to distinguish withdrawal from an event of withdrawal, and to apply RULPA § 604 only to withdrawals within the meaning of RULPA §§ 402(2) and 602. This conclusion leaves open the treatment of the partnership interest of a person who ceases to be a general partner other than as a result of a RULPA § 602 withdrawal.

CALLISON & SULLIVAN at § 20:10 (emphasis omitted).

**30.** RODMAN WARD, JR., EDWARD P. WELCH & ANDREW J. TUREZYN, FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 17–604 (4th ed.) (emphasis added).

**31.** That view also was shared in a paper delivered at an ALI–ABA continuing legal education seminar. That paper indicated that, unless otherwise provided, a partner who was declared bankrupt would be entitled to receive his interest's fair value under § 17–604 because bankruptcy would constitute an event of default under § 17–402(a)(4)(b). Gerald K. Smith, *Issues in Partnership and Partner Bankruptcy Cases and Reorganization of Partnership Debtors*, ALI–ABA Continuing Legal Education Course of Study 639, 685 n. 122 (May 2, 1996) ("When there is such a provision, if not invalidated by the Bankruptcy Code, the bankrupt partner will be entitled under § 604 of RULPA to any distribution and the fair value of the general partner's interest in the limited partnership.").

am chary about giving too much weight to this reading of FOLK, though, as it seems more indicative of the difficulty of maintaining the currency of a large treatise, than of a definitive statement of opinion by the authors.[32]

In fact, the arguable conflict in the treatises, and their inarguably cursory treatment of the subject, may be both attributable to textual changes in DRULPA that bear on the issue of how broadly to apply § 17–604. In 1998, § 17–604 of the DRULPA was amended to read "[e]xcept as provided in this subchapter, *a partner who withdraws or otherwise ceases for any reason to be a partner* is entitled to receive ... the fair value of such partner's interest."[33] In its legislative synopsis, the General Assembly stated that § 17–604 was amended to confirm that "the valuation of a person's interest in a limited partnership and the timing of payment of the value of that interest [applies] regardless of the reason for a person's ceasing to be a partner of a limited partnership."[34] Then, the next year, 1999, the General Assembly again amended § 17–604 to "restore language previously deleted from the Act" that provided, "Except as provided in this subchapter, *upon withdrawal any withdrawing partner* is entitled to receive

... the fair value of such partner's partnership interest."[35] This language remains in effect today.[36]

The Delaware treatises and legislative history give little insight into the reasons motivating this statutory ping-pong. Therefore, it is useful to determine what the practical problem is that requires such close scrutiny and linguistic parsing. Essentially, the problem is that in some circumstances it makes perfect sense to accord a former general partner the right to receive the fair value of its partnership interest upon departure, but in other circumstances involving an "event of withdrawal," such as when a general partner has transferred its interest to a successor general partner (if the partnership agreement allows) or to an assignee, a payout of the partnership interest would be contrary to other sections of the DRULPA, such as § 17–702.

In that connection, § 17–402(a)(2) states that an event of withdrawal occurs when a partner ceases to be a partner under § 17–702, which addresses assignment of a partner's interest.[37] Respected sources, including our Superior Court, have discussed the nature of a partner's interest[38] and precisely what is assignable.[39] Generally,

---

**32.** I say this because the text of FOLK appears to be based on a 1998 amendment to the DRULPA that broadened the language of § 17–604 to cover all situations when a general partner "ceased" to be such. But, as the treatise itself acknowledges, that broadening amendment was replaced the very next year by the original, narrower language drawn from § 604 of the 1985 RULPA. *See* FOLK at § 17–604.2 & nn. 3–4 (2004 Suppl.).

**33.** Assem. B. 312 § 15, 139th Gen. Assem., 2d Reg. Sess. (Del. 1998) (emphasis added).

**34.** *Id.*

**35.** Assem. B. 177 § 12, 140th Gen. Assem., Reg. Sess. (Del. 1999) (emphasis added).

**36.** 6 *Del. C.* § 17–604 (2006).

**37.** Re–RULPA also cured this defect in the 1985 RULPA by stating that "[a] transfer, in whole or in part, of a partner's transferable interest: ... does not by itself cause a partner's dissociation or a dissolution...." Re–RULPA § 702.

**38.** *See The City of Wilmington v. Bassett Partners, L.P.*, 2000 WL 1211513, at *2–3 (Del.Super. June 30, 2000) (discussing the nature of a partner's interest in a limited partnership and the transferability of that interest).

**39.** *E.g.*, LARRY E. RIBSTEIN & ROBERT R. KEATINGE, RIBSTEIN AND KEATINGE ON LIMITED LIABILITY COMPANIES § 7:5 (2006) (discussing that a member's economic interest in an LLC is freely assignable); *Id.* § 7:11 (stating that "LLCs and limited partnerships are identical regard-

commentators have read § 17–702 as indicating that the economic rights of a general partner's equity interests, as set forth in § 17–702, are freely assignable to a third party, absent a provision in the Limited Partnership Agreement to the contrary.[40] The partner's management and voting rights, in contrast, are not assignable. Therefore, if § 17–604 applied to all events of withdrawal, including one caused by § 17–702, then an assignment under § 17–702 would arguably provide a general partner's assignee with one of two conflicting statutory entitlements—the right to a continuing economic interest under § 17–702 or the right to a fair value payment under § 17–604. That clash suggests that § 17–604 likely was intended to have a narrower scope than one sweeping in all events of withdrawal.

Importantly, the structure and language of the DRULPA itself also lends support to reading § 17–604 as applying only to general partners who withdraw under § 17–602 and limited partners who withdraw under § 17–603. Earlier, in § 17–402, the statute discusses all "events of withdrawal," but § 402(a)(1) specifically addresses a general partner who "withdraws" under § 17–602, which discusses a general partner's default right to "withdraw" and later refers to a "withdrawing general partner." Similarly, § 17–603 discusses a limited partner's right to "withdraw." Then, the very next section, § 17–

604, refers to "withdrawal" by any "withdrawing partner," which tracks the language used in § 17–602. That is, § 17–604 never explicitly discusses "events of withdrawal" but rather discusses a "withdrawing partner," which is an "event of withdrawal" under § 17–402(a)(1). That the scope of § 17–604 is limited to partners who withdrew under §§ 17–602 and 17–603 is reinforced by the language giving a "withdrawn partner" the right to fair value "[e]xcept as otherwise provided in this subchapter." That proviso suggests a focus on only those partners who in fact "withdraw" under §§ 17–602 and 17–603. Why read § 17–604 and its proviso this way? Because § 17–604 grants an affirmative right to a fair value payment only to "withdrawing partners" under §§ 17–602 and 17–603 that is subject only to the other provisions of subchapter VI, and the consequences of other events of withdrawal listed in § 17–402 are actually addressed in later subchapters.[41] That is, § 17–604 is contained in Subchapter VI of the DRULPA, and provisions addressing an event of withdrawal occurring as a result of assignment, death, or incompetence are located in Subchapter VII of the DRULPA. By its own terms and place within the DRULPA, then, § 17–604 seems to contemplate that it will apply only to "withdrawing partners" in the limited universe of Subchapter VI.

---

ing the nature of the member's interest and ... what is ... assignable").

**40.** *See* Lubaroff & Altman at § 4.24 at 4–31 ("Unless a partnership agreement provides otherwise, Section 17–702 permits the free assignment and transfer of a partnership interest of a general partner in a Delaware limited partnership."); Ribstein & Keatinge at § 7:5. Here, the default that a general partner may assign its interest holds because the Limited Partnership Agreement does not state otherwise. That Agreement only limits the

general partner's right to "admit a person as a General Partner" or "assign the rights of the Limited Partners." LPA § 9.4(d)-(e).

**41.** Besides the assignment example dealt with by § 17–702, § 17–705 addresses what happens when a partner dies or becomes incompetent. Section 17–705 suggests that a partner's estate or personal representative becomes an assignee with § 17–702 rights and does not obtain the rights set forth in § 17–604.

Furthermore, that this is the proper reading of DRULPA is suggested by the 1999 amendment to § 17–604. That amendment removed language added in 1998 that the provided a § 17–604 payout right "to a partner who withdraws or otherwise ceases for any reason to be a partner. . . ." The revised statute permits such a right "upon withdraw" to "any withdrawing partner." This suggests that the General Assembly intended to include within the coverage of § 17–604 only partners withdrawing under § 602 or 603 and to exclude from the coverage of § 17–604 partners who "otherwise cease[d] for any reason" to be a partner.

Because the narrower reading of § 17–604 poses fewer conflicts with other sections of the DRULPA, is more consistent with the structure and language of the statute, and is supported by the legislative history, I hew to it. That raises the question of what to do with the interest of a former general partner like Howard, whose removal resulted in an "event of withdrawal" under § 17–402, but where (unlike assignment which is covered by § 17–702) there is no other DRULPA section discussing what happens to the general partner's economic stake in the partnership.

In the absence of an applicable provision, the DRULPA provides in § 17–1105 that "the Delaware Uniform Partnership Law in effect on July 11, 1999 . . . and the rules of law and equity . . . shall govern."[42] Since the DRULPA is silent as to how to treat a partner who is removed pursuant to § 17–402(a)(3) and, by its literal terms, § 17–604 does not apply to a partner who is removed, § 17–1105 applies. Thus, I must engage in yet another statutory scavenger hunt to fill this gap.

Unfortunately, the Delaware Uniform Partnership Law (the "DUPL"), which was in effect on July 11, 1999, does not explicitly address the scenario of a partner who is expelled pursuant to a partnership agreement that permits both his expulsion and the continuation of the partnership business thereafter. At best, the DUPL confronts this issue obliquely in § 1538(a), which entitles an expelled partner to receive "the net amount due from the partnership," provided he is discharged from all partnership liabilities by agreement or payment.[43] But, on its face, § 1538(a) neither expressly permits the continuation of the business nor indicates the calculus to be employed in determining the "net amount due" in that context.[44] Learned commentary on the Uniform Partnership Act of 1914 (the "UPA"), the model statute from which the language of the DUPL was drawn, provides some helpful gloss on the statutory language. As interpreted, the UPA permits an expelled partner of a continuing partnership to receive "the net value of his interest as though the firm had been dissolved and liquidated"[45] and to

---

**42.** Although the Delaware Uniform Partnership Law (the "DUPL"), codified at 6 *Del. C.* § 1501, *et seq.*, was repealed as Delaware's operative general partnership statute upon the enactment of the Delaware Revised Uniform Partnership Act (the "DRUPA"), the DUPL remains applicable with respect to limited partnerships. *See* 6 *Del. C.* § 15–1205 ("Except with respect to limited partnerships (see 6 Del. C. § 17–1105), effective January 1, 2002, the Delaware Uniform Partnership Law, 6 Del. C. § 1501— § 1553 is repealed."); *see also* Del. S.B. 178, 141st Leg., 1st Sess., 73 Del. Laws, ch. 73, § 27 (2001) (amending § 17–1105 of the DRULPA to explicitly reference the older DUPL rather than the newer DRUPA).

**43.** 6 *Del. C.* § 1538(a).

**44.** *See id.*

**45.** ALAN R. BROMBERG AND LARRY E. RIBSTEIN, BROMBERG AND RIBSTEIN ON PARTNERSHIP § 17.13(c)(1) (2006 ed.).

include in this value any accumulated goodwill of the partnership.[46] Assuming that the hypothetical liquidation price was based upon the highest and best use of the dissolving partnership's assets and that those assets were most valuable sold as a going concern, the "net amount due" would be equivalent to "fair value" in the sense that the expelled partner would receive his pro rata share of the liquidation value, which would include goodwill. Thus, the provision of the DUPL that has most relevance to the current context is best read as pointing toward a fair value payout.

Fortunately, less equivocal context-specific guidance can be found in the Delaware Revised Uniform Partnership Act (the "DRUPA") which superseded the DUPL and is in effect today. Although not directly linked to the DRULPA by § 17–1105, the DRUPA provides the best indication of what equity as the ultimate default requires in this precise context.[47] In fact, one of the reasons for the enactment of the DRUPA was to replace the DUPL's murky provisions concerning dissolution events with clearer ones.[48]

Under the modern DRUPA, "expulsion pursuant to a partnership agreement" causes disassociation of that partner under § 15–601 rather than dissolution of the partnership under § 15–801.[49] In this manner, the new statute explicitly recognizes that after the expulsion of a partner, the partnership is not required to dissolve and liquidate its business. Instead, the remaining partners may continue to operate the partnership business provided that a buyout payment is made to the expelled partner in an amount "equal to the fair value of such partner's economic interest as of the date of dissociation based upon such partner's right to share in distributions from the partnership" as required by § 15–701.[50]

Thus, under either my best sense of how the DUPL's (albeit admittedly cloudy) terms would address this dispute or how principles of equity would fill the statutory void in the DRULPA, a partner who is expelled pursuant to a partnership agreement is entitled to receive fair value for his partnership interest. Therefore, though not literally addressed in the DRULPA, turning to Delaware's general partnership acts leads to the same result as if § 17–604 governed the "event of withdrawal" caused by a partner's removal. Thus, contrary to Howard's assertions, his inability to elect to become a limited partner does not result in a forfeiture of his

**46.** *Id.* at § 17.13(e)(1).

**47.** I say this because a judge making common law should give weight to evolutions in statutory law and because those evolutions comport with the traditional maxim, "equity abhors a forfeiture." *See Delaware Trust Co. v. Partial,* 517 A.2d 259, 262 (Del.Ch.1986) (explaining that equity will follow the law and extend by analogy the policies reflected in rules of law where appropriate); *see also Jefferson Chemical Co. v. Mobay Chemical Co.,* 267 A.2d 635, 637 (Del.Ch.1970) (applying the equitable maxim).

**48.** *See* Del. S.B. 176, 140th Leg., 1st Sess., 72 Del. Laws, ch. 151, § 1 (1999) (enacting the DRUPA). In its synopsis, this bill indicates that the DRUPA is "a substantial moderniza-

tion of general partnership law in that, inter alia, it ... generally provides that a partnership does not dissolve upon the dissociation of a partner;" as a result, the new DRUPA much more clearly and directly addresses the situation when a partner is expelled and the partnership business is continued. *Id.*

**49.** *See* 6 *Del. C.* §§ 15–601; 15–801; *see also* Paula J. Dalley, *The Law of Partnership Expulsions: Fiduciary Duty and Good Faith,* 21 CARDOZO L.REV. 181, 202 n. 130 (1999) ("Under the R.U.P.A., [on which the DRUPA is based] an expulsion causes the expelled partner's 'dissociation,' but does not lead to dissolution, winding up, or termination.").

**50.** 6 *Del. C.* § 15–701(a)–(b).

capital contribution. At the very least, Howard's economic investment would be protected from forfeiture if he filed an equitable action to recover that amount. One hopes that the Limited Partners and Stallkamp, guided by their counsel, will work with Howard to determine the fair value of his partnership interest and avoid further litigation as to Howard's entitlement.

\* \* \*

A coda seems appropriate. As noted, in 2001, the National Conference of Commissioners on Uniform State Laws adopted a new Uniform Limited Partnership Act which addressed the interpretative question from the 1985 RULPA I have just addressed.[51] The 2001 Act made clear that an expelled general partner was left with the rights equivalent to that of an assignee under § 17–702 of the DRULPA, rather than to a fair value payout as in § 17–604 of the DRULPA.[52] It may be that the General Assembly will desire to update our DRULPA to reflect the 2001 Uniform Act. To date, however, it has not done so and my reading tracks the better interpretations of the 1985 RULPA, on which the DRULPA is based.

C. *Does Howard Have Standing To Bring The Remaining Fiduciary Duty And Contractual Claims Against The Limited Partners And New General Partner?*

█ The Limited Partners and Stallkamp assert that because Howard is not a

limited partner of Venhill, he does not have standing to pursue claims against the other partners based on contractual or fiduciary obligations. As discussed, Count I will be dismissed. As a result, Howard does not have standing under §§ 17–1001 or 17–1002 to prosecute claims on behalf of Venhill. Therefore, he cannot state a claim derivatively, which he attempts to do in Counts IV–VII. Additionally, in Counts IV–VII, Howard attempts to state claims "in his capacity as a Venhill limited partner." Having dismissed Count I, he cannot state claims as a limited partner of Venhill.

The remaining issue, though, is whether Howard has standing in his "individual capacity" to bring any of the claims contained in the amended complaint. The Limited Partners and Stallkamp believe that only a partner has standing to sue for violations of the Limited Partnership Agreement or breach of fiduciary duties beyond the date of his removal. They are correct. In this case, as discussed, Howard's right is to receive the fair value of his partnership interest as of the date he was removed. Once Howard was removed, he became simply a contract claimant holding fixed rights. All of the counts contained in Howard's amended complaint challenge action taken following his removal on July 26, 2005. Therefore, the remaining counts, Counts III–VII, are dismissed because Howard lacks standing to challenge any events that occurred following his removal.

---

**51.** As of February 2006, the 2001 Act had been adopted in Florida, Hawaii, Iowa, Illinois, Minnesota, and North Dakota. Thomas E. Rutledge, *The Alphabet Soup of Unincorporated Business Law: What is Happening With LLCs, LPs, LLPs, GPs, LLLPs, & BTs, and Dealing with RUPA, ReRULPA, (Re)ULLCA, UNETA, MITA, & META,* ALI–ABA Continuing Legal Education, at \*6 (2006).

**52.** Re–RULPA § 603 ("A person is dissociated from a limited partnership as a general partner upon the occurrence of any of the following events: ... (3) the person's expulsion as a general partner pursuant to the partnership agreement."); *Id.* § 605 ("Upon a person's dissociation as general partner: ... any transferable interest owned by the person immediately before dissociation in the person's capacity as a general partner is owned by the person as a mere transferee.").

## IV. Conclusion

Because the Limited Partnership Agreement did not permit Howard to elect to become a limited partner upon his removal as general partner, the motions of the Limited Partners and Stallkamp are GRANTED, and Count I is DISMISSED. Therefore, as the remaining counts challenge action after Howard was removed as general partner, which was an event of withdrawal, the Limited Partners' motion to dismiss Counts III, IV, V, and VII is GRANTED, and Stallkamp's motion to dismiss Counts III and VI is GRANTED. The result, then, is that all Counts in the amended complaint are DISMISSED. Each side to bear its own costs. IT IS SO ORDERED.