# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| DOMAIN ASSOCIATES, L.L.C., a Delaware limited liability company, JAMES C. BLAIR, BRIAN H. DOVEY, BRIAN K. HALAK, KIM P. KAMDAR, JESSE TREU, AND NICOLE VITULLO, | ) ) ) ) ) ) | |
| Plaintiffs/Counterclaim Defendants, | ) ) ) | |
| v. | ) ) | C.A. No. 12921-VCL |
| NIMESH S. SHAH, | ) ) ) | |
| Defendant/Counterclaim Plaintiff. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: May 15, 2018
Date Decided: August 13, 2018

Brian M. Rostocki, Benjamin P. Chapple, REED SMITH LLP, Wilmington, Delaware; Scott D. Baker, James A. Daire, REED SMITH LLP, San Francisco, California; *Attorneys for Plaintiffs/Counterclaim Defendants*.

Elena C. Norman, Tammy L. Mercer, Lakshmi Muthu, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Michael A. Kahn, Nathaniel P. Bualat, CROWELL & MORING, San Francisco, California; *Attorneys for Defendant/Counterclaim Plaintiff*.

**LASTER, V.C.**

Nimesh S. Shah was a member of the management company of a venture capital firm. The other members exercised their right under its operating agreement to force Shah to withdraw. They paid him the value of his capital account.

This post-trial decision holds that Shah was entitled to receive the fair value of his member interest as of the date on which he was forced to withdraw. This decision awards him damages equal to the difference between the fair value of his interest and the amount he received, plus pre- and post-judgment interest until the date of payment.

## I.      FACTUAL BACKGROUND

Trial took place over three days. The parties submitted 344 joint exhibits and lodged seven depositions. Four fact witnesses and two experts testified live. The following facts were proven by a preponderance of the evidence.

### A.      The Venture Capital Firm

Domain Associates is a venture capital firm that focused on the biopharmaceutical, diagnostic, and medical device sectors.[1] James Blair, Jesse Treu, and Jennifer Lobo co-founded Domain in 1985.

---

[1] PTO ¶ 1. Citations in the form "PTO" refer to stipulated facts in the pre-trial order. *See* Dkt. 127. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX —— at ——" refer to trial exhibits using the JX-based page numbers generated for trial.

Like many venture capital firms, Domain encompasses a constellation of entities. Every two years or so, Domain forms a limited partnership to serve as a numerically designated investment fund. This decision refers to the funds as "Fund I," "Fund II," etc.

For each fund, Domain forms a fund-specific limited liability company that serves as its general partner and receives carried interest in the fund. Each is called "One Palmer Square Associates" followed by a number corresponding to the fund. Taking the parties' lead, this decision refers to these entities as "OPSA I," "OPSA II," etc.

The human principals of Domain become members of the fund-specific entity that serves as the general partner. If the investment fund does well, then the principals of Domain receive the bulk of their compensation through their share of the carried interest.

The investment funds and their general partners are designed to have limited lives. As with many venture capital funds, the expected lifespan of a Domain fund is ten years. During the first three to five years, the fund deploys capital. Over the balance of the fund's lifespan, the fund tends to and then harvests its investments.

The constant at the center of the Domain venture capital universe is the management company. It houses the administrative functions for the fund complex, spearheads the formation of each new investment fund and general partner entity, and acts as the investment manager for the funds. For these services, the management company receives

management fees.[2] In general, the management company expects to receive fees equal to approximately 2% of assets under management.[3]

The human principals of Domain own the equity of the management company. They receive guaranteed payments—a salary equivalent—from the management company. They also receive periodic distributions.

When Blair, Treu, and Lobo initially founded Domain, they set up the management company as a partnership. In 1999, they converted the partnership into plaintiff Domain Associates, LLC, a Delaware limited liability company. This decision strives to use the term "Company" to refer to the management company and the term "Domain" to refer to the fund complex and its principals as a whole.

## B. The Company's LLC Agreement

When Domain's principals formed the Company, it had five members: the three founders (Blair, Treu, and Dovey) plus Katherine Schoemaker and Arthur Klausner.[4] Domain's attorneys drafted the operating agreement based on what the members wanted. Article VII of the original operating agreement permitted the members to force any particular member to withdraw, as long as the non-withdrawing members voted

---

[2] Kraeutler Tr. 235-36.

[3] Blair Tr. 39; Saba Tr. 540; *see* JX 32 at DA_0000878.

[4] The parties used the terms "managing member" and "member" interchangeably. Domain is a member-managed entity. Its status makes the former term misleading, because it implies the existence of non-managing members and thus a manager-managed structure. This decision uses the term "member," although the term "Managing Member" appears in many of the documents.

3

unanimously in favor of forcing the member to withdraw.[5] A member also could retire voluntarily or could be deemed to withdraw by operation of law in the event of insanity, bankruptcy, or death.[6]

In 2004, the members of the Company adopted an amended and restated limited liability company agreement.[7] At this point, there were eight members: the original five, plus Robert More, Nicole Vitullo, and Olav Bergheim.[8] The members did not make any changes to the withdrawal provision that are material to this litigation.[9]

Blair testified that he believed from the outset, under the original agreement and every subsequent agreement, that whenever a member withdrew for any reason, the member would receive the amount of their capital account balance and nothing more.[10] There are no contemporaneous documents to support this position, and until the events giving rise to this litigation, Domain never asserted that a withdrawing member was only

---

[5] JX 2 art. VII. For Blair, there was an additional hurdle: the other members could force him to withdraw only if they also held at least 72% of the member interest. *Id.* § 2.05. Blair held a 30% member interest, so he could not be forced to withdraw.

[6] JX 2 art. VII.

[7] JX 22.

[8] *Id.*

[9] *Compare* JX 2 art. VII *with* JX 22 art. VII. They did remove the 72% voting hurdle to remove Blair, meaning he could be removed in the same manner as any other member. Although I do not find the argument material to the outcome of the case, I am skeptical that Blair would have given up his blocking right if he thought he could be forced to withdraw for just the amount in his capital account.

[10] Blair Tr. 24-25.

4

entitled to the value of his or her capital account. Every time a member withdrew, the member received significantly more.[11]

## C.     Shah Joins Domain.

In 2006, Shah joined Domain as an employee.[12] He focused on the medical device sector.[13] He rose through the ranks, receiving promotions in 2008 and 2013.[14]

For much of this period, Domain was in its salad days. In 2000, Domain raised Fund V, with $464 million in committed capital. In 2003, Domain raised Fund VI, with $500 million in committed capital. In 2006, Domain raised Fund VII, with $700 million in committed capital. In 2009, Domain raised Fund VIII, with $500 million in committed capital.[15] These large funds provided the Company with a steady stream of management fees: $24.4 million in 2006, $25.4 million in 2007, $25.7 million in 2008, $26.9 million in 2009, $25.7 million in 2010, and $29.7 million in 2011.[16]

Towards the end of this period, however, Domain's fortunes ebbed. At $500 million, Fund VIII was a substantial fund, but it came in $200 million below the firm's fundraising

---

[11] *See* JX 26; JX 30; JX 52; JX 54; JX 266 at 14-15; Blair Tr. 29, 33, 36-38, 60-62.

[12] PTO ¶ 8.

[13] *Id.* ¶ 9.

[14] *Id.* ¶ 10; DX 5; *see also* JX 73.

[15] JX 246.

[16] *See* JX 40; JX 43; JX 58; JX 64; JX 66; JX 69.

goal of $700 million.[17] After falling short on Fund VIII, Domain cut the forecasted size of Funds IX and X from $700 million to $500 million.[18] In 2012, Domain deferred the projected closing of Fund IX from 2012 until 2014.[19] Domain also deferred Funds X and XI by two years.[20]

These setbacks stemmed from investor dissatisfaction with the firm's track record. Funds VI and VII performed poorly, both on an absolute and relative basis.[21] Fund VIII did better on an absolute basis, but not on a relative basis.[22] Domain's investors worried that the firm's core investment strategy had lost its efficacy.[23] They also worried that as the firm's founders neared retirement, the generational transition posed additional risks.[24] With many other managers to choose from, they began taking a pass on Domain.

The smaller-than-expected size of Fund VIII and the deferral of Fund IX affected the Company's income stream. In 2012, the Company received roughly $25.6 million in

---

[17] *See* JX 57 at DA_0000899.

[18] *See* JX 63 at DA_0000906; JX 68 at DA_0000926.

[19] JX 71 at DA_0000943.

[20] JX 71 at DA_0000943.

[21] Halak Tr. 324-25.

[22] *Id.*

[23] *Id.* at 325.

[24] *Id.* at 326.

management fees, some $4 million less than in 2011.[25] In 2013, the Company received $22.1 million in management fees, down more than $3 million from 2012.[26] With the fundraising environment not looking any better, Domain cut the forecasted size of Funds IX, X, and XI from $500 million each to $350 million each.[27]

## D.    Shah Becomes A Member.

In mid-November 2014, Domain invited Shah to become a member of the Company.[28] One month later, on December 15, 2014, Fund IX closed with $80 million in committed capital, roughly one ninth of the original target of $700 million and one quarter of the reduced target of $300-350 million.[29] Fund IX had only had six limited partners, one of which was a retired principal of Domain.[30] By contrast, Fund VII had approximately sixty limited partners, the majority of which were institutional investors.[31]

---

[25] JX 72 at DA_0001089.

[26] JX 86 at DA_0001094.

[27] JX 84 at DA_0000951.

[28] *See* DX 5.

[29] JX 63 at DA_0000906; JX 84 at DA_0000951; Blair Tr. 226; Kraeutler Tr. 268.

[30] JX 127 DA_0875386; Halak Tr. 319-21.

[31] JX 132 at DA_087478-79; Halak Tr. 317-19. Domain later raised some additional money for Fund IX and had a second closing in 2016 that brought its total size to $90.67 million—still a disappointment. *See* JX 246; JX 336; Blair Tr. 226; Halak Tr. 308.

On January 1, 2015, the existing members and Shah executed the Company's Seconded Amended and Restated Limited Liability Company Agreement (the "LLC Agreement").[32] Shah was allocated a 10.62% membership interest.[33]

At the time of his admission as a member, Shah made a capital contribution of $25,000 to the Company.[34] This amount did not reflect the value of his member interest. It was a token buy-in to memorialize Shah's new status as an equity participant in Domain.[35] Domain's policy from the outset had been not to require that new members of the firm make a significant capital contribution.[36] As a member of the Company, Shah also became a member of OPSA IX, the LLC that served as the general partner for Fund IX.[37]

On January 13, 2015, Domain's CFO circulated an email to Shah and the existing members that attached the new LLC Agreement, a blackline against the previous version, a schedule of membership and sharing percentages, and a member consent that would set up Shah's guaranteed payments. She asked the members to call with any questions.[38]

---

[32] JX 102.

[33] PTO ¶ 15.

[34] *Id.* ¶ 14.

[35] *See* Blair Tr. 116-17; JX 95 at DA_0986967.

[36] Blair Tr. 116-17.

[37] JX 100.

[38] JX 103.

Domain and Shah never negotiated the terms of the LLC Agreement.[39] Shah did not ask any questions; he did not even bother to read the LLC Agreement carefully.[40] He correctly understood that he was being offered a promotion to what colloquially would be called "equity partner" on a take-it-or-leave-it basis. Shah signed the LLC Agreement and became a member of the Company effective January 1, 2015.[41]

## E. Domain's Financial Situation Continues To Decline.

Soon after Shah became a member, his colleagues began questioning whether the firm should remain committed to investing in the medical device space—the area where Shah focused. During the fundraising process for Fund IX, several of Domain's primary sources of capital had criticized Domain's continued emphasis on the medical device sector.[42] In a June 2015 strategy discussion about how to invest Fund IX, all of the Company's members, including Shah, agreed that returns on medical device companies had severely lagged other sectors between 2002 and 2014.[43]

In July 2015, Blair and Dovey began discussing whether to terminate Shah and how much to provide in severance, but they decided not to make a final decision until the end

---

[39] PTO ¶ 13.

[40] Shah Tr. 444.

[41] PTO ¶ 11.

[42] *See* JX 112; JX 143 at DA_0565357; Blair Tr. 48-49; Halak Tr. 316, 321, 325.

[43] JX 107 at DA_0227130; Halak Tr. 343-46.

9

of the year.[44] In August, an acquirer purchased one of the portfolio companies that Shah had sponsored as an investment, resulting in an upfront payment of $60 million to Fund VIII.[45] This was not enough to change anyone's mind about medical devices. Even Shah recognized that the "opportunity set in medical devices remain[ed] limited."[46]

In December 2015, Schoemaker resigned from the Company due to a terminal illness. Her withdrawal caused the remaining members' percentage interests to rise proportionately. Shah's interest increased to 12.1%.[47]

Also during December 2015, the members approved a series of budget cuts in anticipation of considerably lower management fees. One dramatic step was an across-the-board cut in the members' compensation. Shah voted in favor of reducing the other members' compensation but against reducing his own.[48] The Company also took other steps, such as eliminating the annual holiday party, freezing staff salaries, no longer

---

[44] *See* JX 109; JX 110 at DA_0370186.

[45] JX 111 at DA_0255130; Blair Tr. 43-44, 114.

[46] JX 112.

[47] *See* PTO ¶ 17; JX 237.

[48] Halak Tr. 350-51; Shah Tr. 412-13; *see* JX 143 (Blair to Dovey: "[Shah] believes his compensation differential with other managing members is no longer appropriate. He believes that he ought to be kept at $700,000, and the rest of us reduced to $750,000).

funding OPSA capital calls for OPSA participants, consolidating office space, and canceling consulting arrangements.[49]

## F. Shah Is Asked To Leave.

As part of the budgetary restructuring in December 2015, the members other than Shah decided that the Company no longer needed a medical devices professional and that Shah should be asked to leave.[50] Shah testified that when he later learned of the decision, it came as a surprise to him,[51] but he seems to have anticipated it.[52] On January 4, 2016, he asked Blair what he would do if he were "in [Shah's] shoes."[53] Blair knew Shah had not been happy about the reduction in member compensation, and he told Shah that whenever he was unhappy in a position, he found it best to leave.[54] The day after the meeting, Shah

---

[49] *See* JX 123; JX 143 at DA_0001941; Kraeutler Tr. 239, 246-47, 276; Halak Tr. 349-50.

[50] JX 143; Blair Tr. 51-52, 55-56.

[51] Shah Tr. 382.

[52] *See* JX 143 at DA_056537 (Blair to Dovey: "But we need to terminate him, don't you think? I'm pretty sure he expects it. He actually tried to pry this out of Sue Stone this past week, for some reason!")

[53] *Id.* at DA_056537.

[54] Shah Tr. 414-15.

began networking in search of a job.[55] He also emailed himself the LLC Agreement,[56] and he reviewed the provisions on member departures.[57]

Shah asked for a follow up meeting with Blair and Dovey for January 19, 2016.[58] During that meeting, Blair and Dovey told Shah that the other members had decided he should leave.[59] Shah did not handle the news well. Blair and Dovey tried to talk about a severance package, but Shah became petulant, said he could not handle the discussion, and asked that they send him a written proposal.[60] Shah also asked Blair and Dovey not to say or do anything that suggested he agreed with the other members' decision.[61] On February 4, after going back and forth with Shah on the language, the Company sent out an internal announcement about Shah's departure.[62]

---

[55] *Id.* at 405. *See* JX 141; Shah Tr. 418-19.

[56] Shah Tr. 419-20.

[57] *Id.* at 419-21.

[58] *See* JX 140.

[59] Shah Tr. 382.

[60] *Id.* at 382-83.

[61] *Id.* at 421-22; *see* JX 154 (Shah to Dovey: "As I indicated when we met in person, however, I would expect that the partners and partnership would refrain from any statements or activities which give the false impression that I was consulted in these matters or that I agreed with them.").

[62] *See* PTO ¶ 22; JX 150; JX 154; JX 155.

On the four prior occasions when members had left the Company, the firm had reached agreement with the departing member on a severance package, and the resulting departure had been consensual.[63] Blair hoped to achieve the same result with Shah, and he made several attempts to follow up with Shah. Blair wanted to have a discussion in person, but each time, Shah demurred or deferred.[64]

On February 22, 2016, after a full month of trying to have a face-to-face discussion, Blair emailed Shah the following set of "Economic Talking Points."

- Shah would convert to employee status as of March 1, 2016, and stay on the payroll through June 30, 2016.

- Shah would be compensated based on an annualized salary of $579,000.

- Shah would be paid the balance of his capital account.

- Shah would remain fully vested in Funds VII and VIII, and would retain his partial vesting in Fund IX. Alternatively, he could elect to be bought out of Fund IX.

- Beginning on June 1, 2016, Shah would go on COBRA, with the Company paying his premiums through December 31, 2016. At his own expense, Shah could remain on the Company's health policy through COBRA through 2017.

- The Company would pay for Shah's life and disability insurance through November 2016.

- The Company would pay for Shah's car until the lease expired in August 2016.[65]

---

[63] *See* JX 26; JX 30; JX 52; JX 54; JX 266 at 14-15; Blair Tr. 29, 33, 36-38, 60-62.

[64] Blair Tr. 73.

[65] JX 161 at DA_1495660.

13

Shah asked only that the offer stay open until the end of March so he could discuss it with his attorneys.[66]

On March 7, 2016, Blair sent Shah a "98% final draft" of a severance agreement.[67] Blair and Shah agreed to let the attorneys finalize the arrangements.[68] That would prove to be a fateful decision, because involving the lawyers caused matters to escalate, but very little happened for the balance of the month.

Meanwhile, Shah had found a new job. As noted, Shah began his job search in January 2016. By early March, Shah was setting up interviews.[69] His first choice was Fractyl Laboratories Inc., a portfolio company in Fund VIII.[70] Shah was a member of Fractyl's board of directors and already had deep connections there.[71]

Shah reached out to Harith Rajagopalan, the co-founder and CEO, and Allan Will, the chairman of the board.[72] They discussed having Shah join as Chief Business Officer.[73] Shah next met with the full executive team in Boston, and he and Rajagopalan began

---

[66] JX 160.

[67] JX 182; Shah Tr. 384.

[68] *See* JX 187-88; Shah Tr. 393.

[69] *See* JX 186; JX 195.

[70] Shah Tr. 425.

[71] *Id.* at 425-26.

[72] *Id.* at 426.

[73] *Id.* at 426-27.

14

discussing compensation.[74] By late March, they had reached an agreement, but Shah said he could not sign until his employment with Domain ended.[75] During this period, Shah did not mention to Domain that he was negotiating with Fractyl.[76]

In April 2016, Shah began performing substantive work for Fractyl. Among other things, he helped poll investors about a potential initial public offering and worked through ideas for Fractyl's product development.[77] Shah did not mention this to Domain.[78]

On April 6, 2016, the lawyers had a call. Shah's litigation counsel told Domain's counsel what Shah believed he was owed.[79] Matters went downhill from there, and Blair concluded that Shah would likely sue.[80]

After the lawyers' call, Shah made multiple demands for information from the Company.[81] Domain personnel resisted giving Shah the information.[82] Shah continued to

---

[74] *Id.* at 428-29. By late March, Shah was negotiating his relocation package with Fractyl. *See* JX 191; Shah Tr. 432.

[75] *See* JX 196 at DA_0000969-71, 977. 983; JX 200; *also* Shah Tr. 406-07, 429-30.

[76] Blair Tr. 74; Shah Tr. 431-32.

[77] JX 196 at DA_0000970-83; Shah Tr. 434-36.

[78] Blair Tr. 74; Shah Tr. 437.

[79] *See* JX 235 at 1.

[80] Blair Tr. 77-78.

[81] See JX 197-99.

[82] *See* JX 199 at DA_0873966.

15

refuse to have any direct communications with Domain about a severance agreement, insisting that everything go through his lawyer.[83]

## G.     The Other Members Require Shah To Withdraw.

On April 13, 2016, the Company noticed a meeting of members for April 18.[84] The subject of the meeting was to vote on Shah's forced withdrawal.

On April 17, 2016, Blair made one last attempt at resolving matters with Shah through a face-to-face meeting. After the discussion, Shah once again asked Blair to provide the deal points in writing.[85] That afternoon, Shah told Rajagopalan that he had reached a "handshake deal" with Blair, that the agreement was "friendly," and he had not gone "for the fully optimized deal" because he was "exhausted and want[ed] to move on."[86] He also told Rajagopalan that he had not yet told Domain about his plans to work at Fractyl and reiterated that he could not sign an employment agreement until he left Domain.[87]

On the morning of April 18, 2016, Blair emailed Shah the deal points that they had discussed.[88] Shah rejected them out of hand and without explanation.[89] At trial, and

---

[83] Blair Tr. 79, 197, 201.

[84] PTO ¶ 23; JX 210.

[85] Blair Tr. 79-80.

[86] JX 196 at DA_0000983-84; *see also* Shah Tr. 436-37; Shah Dep. 71.

[87] JX 196 at DA_0000983.

[88] JX 206; Blair Tr. 80-81.

[89] JX 212.

16

contrary to his contemporaneous messages with Rajagapolan, Shah claimed that he asked for the terms in writing only so that there would be a written record of the Company's final offer.[90] Shah also claimed at trial, again contrary to his contemporaneous messages with Rajagapolan, that he wanted to remain a managing member at Domain.[91]

After Shah rejected Blair's terms, the members' meeting went forward. All of the members, except Shah, voted to require Shah to withdraw from the Company.[92]

After the meeting, the Company immediately stopped paying Shah's insurance benefits.[93] In hindsight, this seems harsh and spiteful, but Blair and his colleagues had become exasperated with Shah and the obstinate and uncooperative positions that he had taken over the preceding four months.[94] Their actions were not laudable, but they were understandable.

With Shah no longer a member, the other members' percentage interests rose.[95] Before Shah's departure, each of the other members owned a 15.51% member interest. After reducing Shah's interest to 0%, the remaining members each owned a 17.65%

---

[90] Shah Tr. 400.

[91] *Id.* at 439-40.

[92] PTO ¶ 24.

[93] JX 213; Blair Tr. 214-15.

[94] *See* Blair Tr. 192; Blair Dep. 165.

[95] Blair Tr. 219-20.

17

member interest.[96] Domain also took the actions necessary to replace Shah on the various portfolio company boards of directors where he had served.[97]

On April 22, 2018, four days after his forced withdrawal, Shah accepted the position he had negotiated with Fractyl.[98]

## H. The Dispute

At the time of his forced withdrawal on April 18, 2016, Shah owned a 12.1% membership interest in the Company.[99] He also had an 11.94% interest in the Company's ownership of "Post 12/31/14 Securities," a 12.1% interest in the Company's ownership of "Post 12/31/15 Securities," and an 11.8% share of the guaranteed distributions that the Company made to its members.[100] Separately, Shah held fully vested ownership positions in OPSA VII and VIII and an ownership position in OPSA IX that was 2.72% vested.[101]

Blair and the other members of the Company took the positon that upon his forced withdrawal, Shah was entitled to a payment equal to his capital account in return for his member interest. According to the Company's records, the balance in Shah's capital

---

[96] JX 321 at 3. This is with the exception of Treu, who had retired and held an 11.75% member interest.

[97] JX 218; JX 221-23.

[98] PTO ¶ 27; JX 224-25; *see also* Shah Tr. 440.

[99] PTO ¶ 17; JX 237 at DA_0753062; JX 321; Blair Tr. 219-20; Kraeutler Tr. 290.

[100] PTO ¶ 17.

[101] JX 229 at 1-2; Kraeutler Tr. 287-88.

18

account was $438,353.05. On May 24, 2016, the Company sent Shah a check for this amount and enclosed a letter explaining the Company's positon.[102]

Shah returned the check.[103] He asserted that the value of his capital account belonged to him, and he rejected what he believed was an effort by the Company to put conditions on the payment.[104] Although Shah implied that he deserved more money, he did not explain why.

The Company responded by letter dated June 17, 2016.[105] The Company offered to allow Shah to have a CPA of his choice review the financial statements used to calculate his payout.[106] The Company also asked Shah to explain why he believed he was owed more.[107] In response, Shah asserted that he was entitled to 12.1% of the Company's cash on hand as of his withdrawal date, which equaled $1,553,667.[108]

On June 21, 2016, Shah's counsel sent Domain's counsel a draft complaint that Shah intended to file if he did not receive his capital account balance.[109] Shah's counsel

---

[102] JX 229; Blair Tr. 84-85.

[103] JX 230.

[104] *Id.* at 1.

[105] JX 234.

[106] *Id.* at DA_1037679.

[107] *Id.* at DA_1037680.

[108] *See* JX 237; Kraeutler Tr. 291; Halak Tr. 353.

[109] JX 235 at 1.

offered to mediate the dispute over any other amounts due if the Company paid Shah's capital account balance.[110] On July 6, the Company wired the money.[111]

On November 18, 2016, the mediation commenced.[112] That same day, the plaintiffs filed this lawsuit.[113] That move undercut the mediation, which proved unsuccessful. This action proceeded through discovery and trial.

## II.    LEGAL ANALYSIS

The central question in this case is how much Shah was entitled to receive after the other members forced him to withdraw. Procedurally, the Company and its remaining members sued first, seeking a declaratory judgment that Article VII of the LLC Agreement specified the payment that Shah was entitled to receive. They sought other declarations, but those contentions fell by the wayside. Shah counterclaimed for breach of contract, asserting that Article VII did not specify a payment and that under the Delaware Limited Liability Company Act (the "LLC Act"), the defendants owed him the fair value of his member interest. He advanced other contentions, but by the time of post-trial briefing, he had focused on his breach-of-contract theory.[114]

---

[110] *Id.*

[111] PTO ¶ 31; Blair Tr. 87.

[112] JX 242; Shah Tr. 409.

[113] *See* Dkt. 1; JX 341; Blair Tr. 205-06.

[114] In periodic footnotes, Shah purported to incorporate his pre-trial briefs by reference. That is not helpful to a busy court and, in my view, is not sufficient to preserve an argument or issue for decision. The point of having full-length, post-trial briefs, as happened here, is for the parties to present their case, on the merits, using the record

Although Shah is formally the defendant, this decision structures the analysis using his counterclaim for breach of contract. This approach recognizes that Shah is the natural claimant. It also recognizes the counterclaims implicates the interpretive issues that the plaintiffs seek to resolve. Shah's counterclaim therefore provides an orderly framework for analyzing the case.

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[115] The first element is easily met: the LLC Agreement is a binding contract that includes Article VII. The remaining elements require further discussion.

## A. Breach Of The Contractual Obligation

Domain contends that Article VII of the LLC Agreement specified that Shah was entitled to receive the value of his capital account. Shah contends that Article VII did not

---

developed at trial. Pre-trial briefs predict what the trial evidence will show, but trials do not always unfold as one side or the other foresaw. The judges and their clerks should not be asked to look back at the pre-trial briefs, then evaluate on their own, without the benefit of post-trial analysis from the litigants, whether or not the earlier positions still hold. In other cases, I have had litigants attempt to incorporate briefing from even earlier phases of the case, such as from the summary judgment phase or by referencing a theory once raised in the complaint. During post-trial briefing, lawyers should be concentrating their advocacy on the issues and arguments that are most likely to prevail based on the evidence presented at trial. It follows that the post-trial briefs and post-trial argument should frame the matter for decision. Consistent with that approach, I have analyzed the case based on the positions the parties took during the post-trial phase, without attempting to reconstruct whether additional arguments raised earlier might apply.

[115] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003); *see Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016) (citing the standard in *H-M Wexford* with approval).

specify a payout, causing the default provisions of the LLC Act to control and entitling him

to the fair value of his member interest. To resolve these arguments, the first step is to

examine Article VII to determine whether it addresses the issue. If it does, then the contract

controls.[116] If not, then the next step is to look to the LLC Act.[117]

### 1. The Plain Meaning Of Article VII

Determining whether Article VII specified the payment that Shah was entitled to

receive presents an issue of contract interpretation. The LLC Agreement is a contract

governed by Delaware law.[118] The Delaware Supreme Court has explained that "[w]hen

interpreting a contract, the role of a court is to effectuate the parties' intent."[119] Absent

ambiguity, the court "will give priority to the parties' intentions as reflected in the four

corners of the agreement construing the agreement as a whole and giving effect to all its

provisions."[120] "Contract language is not ambiguous merely because the parties dispute

---

[116] *See Walker v. Res. Dev. Co. Ltd., L.L.C. (DE)*, 791 A.2d 799, 813 (Del. Ch. 2000).

[117] *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999); *see Levey v. Brownstone Asset Mgmt., LP*, 2014 WL 3811237, at *7 (Del. Ch. Aug. 1, 2014); Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 1.03[A] [2], at 1–14 (2018 Supp.).

[118] JX 102 § 9.07.

[119] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[120] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[121]

Article VII states:

RETIREMENT, DEATH, INSANITY OR BANKRUPTCY

Any Member may retire from the Company upon not less than 90 days' prior written notice to the other Members. Any Member may be required to withdraw from the Company for or without cause at any time upon written demand signed by all of the other Members except for any one other such Member, so long as such demand shall have been approved at a meeting of Members held for such purpose, to which all Members shall be given written notice in advance.

Upon an adjudication that a Member is legally incapacitated or upon the appointment of a custodian, receiver or trustee of his property in any receivership proceedings or in any proceedings for relief of debtors or upon an adjudication of bankruptcy, such Member shall be deemed to have retired from the Company as of the close of business on the date of such adjudication or appointment.

The retirement, death, insanity, bankruptcy or withdrawal of a Member shall not dissolve the Company as to the other Members unless such other Members in accordance with Section 1.04 (excluding for such purpose the Membership Percentage of the withdrawing Member) elect not to continue the business of the Company. In the event that there are no remaining Members, the Company shall dissolve.

If the remaining Members continue the business of the Company, the Company shall pay to any retiring Member, or to the legal representative of the deceased, insane or bankrupt Member, as the case may be, in exchange for his entire interest in the Company, an amount equal to (A) such Member's capital account, to be determined as of the date of a Member's death or retirement, or his withdrawal from the Company (such date of death or withdrawal being referred to herein as the "**Withdrawal Date**"), which capital account, for purposes of such determination, shall be computed on the cash and disbursements basis of accounting, shall take into account, without

---

[121] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (footnote omitted).

23

limitation, the aggregate amount of cash contributed to the capital of the Company by such Member, plus the aggregate amount of such Member's share, as in effect from time to time, of the net profits of the Company through the last day of the month next preceding the Withdrawal Date, less the aggregate amount of such Member's share, as in effect from time to time, of the net losses of the Company through the last day of the month next preceding the Withdrawal Date, less the aggregate amount of distributions to such Member through the Withdrawal Date in respect of the net profits or capital of the Company, or both; less (B) the aggregate amount, if any, of indebtedness of such Member to the Company at the Withdrawal Date.

Payment of the amounts referred to in clause (A) of the preceding paragraph, less the amount referred to in clause (B) of such paragraph, shall be made in cash or in-kind, as mutually agreed between such retiring Member and the Company, to the retiring Member, or to the legal representative of the deceased, insane or bankrupt Member, as the case may be, no later than 120 days after the Withdrawal Date.

Following any such retirement, death, insanity, bankruptcy or withdrawal, such former Member (all persons who shall have ceased to be Members as contemplated by this Article VII, being hereinafter referred to as "**former Members**") or his estate or legal representatives, as the case may be, shall have no part in the management of the Company and shall have no authority to act on behalf thereof in connection with any matter.

The Schedule shall be promptly amended to reflect the deletion of a former Member from the Schedule as a Member, and to reflect the reallocation of Sharing Percentages of any applicable class resulting from such purchase among the remaining Members participating in such class pro rata in proportion to their respective Sharing Percentages in such class in effect immediately prior to such reallocation.[122]

The first two paragraphs of Article VII identify five means by which a member's status as such can terminate: (i) retirement, (ii) death, (iii) insanity, (iv) bankruptcy, and (v) forced withdrawal by vote of the other members. The first paragraph of Article VII sets out the requirements for a forced withdrawal by vote of other members:

---

[122] PTO ¶ 20; JX 102 art. VII.

Any Member may be required to withdraw from the Company for or without cause at any time upon written demand signed by all of the other Members except for any one other such Member, so long as such demand shall have been approved at a meeting of Members held for such purpose, to which all Members shall be given written notice in advance.[123]

The other members complied with these requirements. They gave Shah notice in advance of the April 18, 2016 meeting. All members, except Shah, voted for Shah's removal. Article VII clearly authorized the other members to force Shah to withdraw.

Despite providing a path to force a member to withdraw, Article VII is silent about the payment to be made in that instance. Paragraph four specifies the payment to be made "to any retiring Member, or to the legal representative of the deceased, insane or bankrupt Member, as the case may be, in exchange for his entire interest in the Company." Notably, this list of scenarios does not include a forced withdrawal. Under the plain language of this provision, the payout mechanism does not apply to a forced withdrawal.

At first blush, paragraph four potentially complicates matters by defining a payout formula that includes the concept of "withdrawal." It states that the departing member is entitled to "an amount equal to (A) such Member's capital account, to be determined as of the date of a Member's death or retirement, or his withdrawal from the Company (such date of death or withdrawal being referred to herein as the '**Withdrawal Date**') . . . ."[124] The concept of "withdrawal" in this formula, however, is used generically as a catchall for

---

[123] JX 102 art. VII.

[124] *Id.*

the forms of withdrawal where the payout formula applies. Notably, the formula specifies two of the triggering means of withdrawal (death or retirement) but not two others (insanity or bankruptcy). The formula therefore does not conflict with the limitation of the payout right to a "retiring Member, or to the legal representative of the deceased, insane or bankrupt Member."

Paragraph five of Article VII provides additional details about the form and timing of the payout. It too refers to only "the retiring Member, or to the legal representative of the deceased, insane or bankrupt Member."[125] It does not address a forced withdrawal.[126]

The references in paragraphs four and five of Article VII to a retiring member do not encompass a forced withdrawal. In paragraphs one, three, and six of Article VII, the plain language distinguishes between retirement, which is a voluntary departure, and a "required withdrawal."

Article VII therefore did not specify the amount that Shah would receive after being forced to withdraw. Under a plain language analysis, Shah is correct.

### 2. Extrinsic Evidence

The plaintiffs contend that extrinsic evidence shows that the members intended for Article VII to specify the amount that a member would receive upon a forced withdrawal.

---

[125] *Id.*

[126] Blair Tr. 143-44 (agreeing that paragraphs four and five of Article VII speak explicitly to retiring, deceased, insane, or bankrupt members, but not to forced withdrawals).

Because the scope of Article VII is plain and unambiguous, principles of contract interpretation foreclose consideration of extrinsic evidence.[127]

Assuming for the sake of argument that Article VII was ambiguous, looking to extrinsic evidence would not be the correct solution on the facts of this case. "[I]t is unhelpful to rely upon extrinsic evidence to determine the parties' intent in drafting the contract" when one side drafted the agreement and presented it on a take-it-or-leave-it basis, such that the extrinsic evidence "would yield information about the views and positions of only one side of the dispute."[128] Under those circumstances, the doctrine of *contra proferentem* calls upon the court to construe any ambiguities against the drafter.[129] In this case, Domain drafted the LLC Agreement.[130] Although Shah was told that he could contact Domain's CFO with any questions, Shah did not have the ability to negotiate

---

[127] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

[128] *Bank of N.Y. Mellon v. Commerzbank Capital Funding Tr. II*, 65 A.3d 539, 551 (Del. 2013); *see also United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. 2007) ("[T]he private, subjective feelings" of contract "negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common." (footnote omitted)).

[129] *See Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) ("If the contractual language at issue is ambiguous and if the limited partners did not negotiate for the agreement's terms, we apply the *contra proferentem* principle and construe the ambiguous terms against the drafter."); *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 630 (Del. 2003) (noting that the trial court applied "the well-accepted *contra pr[o]ferentem* principle of construction, which is that ambiguities in a contract should be construed against the drafter.").

[130] JX 103.

substantive terms.[131] The Company admitted Shah on a take-it-or-leave-it basis. Consequently, if Article VII were ambiguous, it would be construed against the plaintiffs.

Finally, assuming for the sake of argument that extrinsic evidence were considered, the most persuasive extrinsic evidence is the Company's course of dealing.[132] The Company has never limited a departing member to his or her capital account. The Company instead has paid every member who left the Company millions more than their capital account.[133] Admittedly, these departures ended up being consensual, but there is no indication that during any of the discussions or negotiations, anyone ever mentioned the concept of forcing a member to withdraw and limiting them to their capital account.[134] The course of dealing conflicts with the Company's position that departing members are entitled only to their capital accounts.

### 3. An Irrational Result

Domain contends that to read Article VII as not specifying the amount Shah would receive generates an irrational result. According to Domain, this outcome "favor[s] derelict

---

[131] Blair Tr. 117-22.

[132] *See Salamone*, 106 A.3d at 375 (explaining that sources of extrinsic evidence "may include overt statements and acts of the parties, the business context, prior dealings between the parties . . . ." (quoting *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013)); *Mass. Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*, 2010 WL 2929552, at *11 (Del. Ch. July 23, 2010) (same).

[133] *See* JX 26; JX 30; JX 52; JX 54; DX 2-4; Blair Tr. 29, 33, 36-38.

[134] *See* Blair Tr. 171-73.

managing members or members whose areas of focus are uneconomic for the firm" by giving them greater compensation than members who withdraw for other reasons.[135]

In my view, the outcome that Article VII dictates is not irrational. Whether a particular member is derelict or failing to contribute involves a question of judgment. Humans frequently disagree about the aptitude and performance of particular individuals, and they often view others as less worthy than themselves. It is rational for sophisticated individuals to be worried about disputes and to want protection against being forced out following a legitimate disagreement over performance or due to a power struggle or personality conflict. If the forced-out member would receive only the value of her capital account, rather than the greater value of a proportionate share of the entity as a going concern, then the other members would gain by ganging up on a disfavored member. It seems rational to me that the members could have sought to protect against this outcome by excluding the forced-withdrawal scenario from the cases covered by the payout formula.

This construct does result in a situation where a forced-out member receives more under the terms of the agreement than a member who retires or who leaves for more sympathetic reasons. But I do not regard that as irrational. The members rationally could have expected that in those situations, they would look after each other and not limit the payment that the departing member would receive to the amount specified by the agreement. In a voluntary departure, a member might expect to leave on good terms and to

---

[135] Pls.' Opening Br. at 40.

receive an agreed-upon severance, which happened on the three documented occasions when members retired voluntarily firm the firm.[136] In the case of sad events like death, insanity, or bankruptcy, the remaining members might well be expected to provide compassionate support to their former colleague, as happened in the one documented instance in the record where this occurred.[137]

"[P]arties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members."[138] The members could have drafted Article VII to address required withdrawals. They did not. That omission does not make its terms irrational. "Parties have a right to enter into good and bad contracts, the law enforces both."[139]

### 4. The Default Rule Under The LLC Act

Because the LLC Agreement is silent as to what payment a member receives after a forced withdrawal, the default provisions of the LLC Act come into play. Shah contends that Section 18-604 of the LLC Act governs. The plaintiffs contend that Section 18-604 does not apply, leaving the court to apply default principles of law under Section 18-1104.

---

[136] *See* Blair Tr. 26-28 (describing departures of Klausner, Bergheim, and More). The three received severance valued in the aggregate at over $12 million. Those payments were not tied meaningfully to their capital accounts. *See* Blair Tr. 208, 211-12, 216-17.

[137] *See* Blair Tr. 60-62 (describing departure of Schoemaker).

[138] *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 880 (Del. Ch. 2009).

[139] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

Section 18-604 does not govern this situation because it applies only to voluntary withdrawals. It states:

> Except as provided in this subchapter, upon resignation any resigning member is entitled to receive any distribution to which such member is entitled under a limited liability company agreement and, if not otherwise provided in a limited liability company agreement, such member is entitled to receive, within a reasonable time after resignation, the fair value of such member's limited liability company interest as of the date of resignation based upon such member's right to share in distributions from the limited liability company.[140]

Authoritative commentators have explained that this provision "uses the term 'resignation' to signify a person's autonomous withdrawal from the company. Absent a modifying provision in the limited liability company agreement, the statutory rules relating to a member's resignation apply to any transaction of this nature, whether labeled as a 'resignation,' as a voluntary 'withdrawal,' or otherwise."[141] Elsewhere, the LLC Act uses the term "expulsion" to refer to the forced withdrawal of a member.[142] Although there does not appear to be any decision that has reached this conclusion for Section 18-604 of the LLC Act, Chief Justice Strine reached a similar conclusion while serving as Vice

---

[140] 6 *Del. C.* § 18-604.

[141] Symonds & O'Toole, *supra*, § 5.04[B][1], at 5-51.

[142] *See* 6 *Del. C.* § 18-801(b) (providing that LLC will not automatically dissolve upon "death, retirement, resignation, expulsion, bankruptcy, or dissolution of any member . . .").

Chancellor when he interpreted comparable provisions of the Delaware Revised Uniform Limited Partnership Act (the "LP Act").[143]

To support his effort to read Section 18-604 more broadly, Shah points to *Olson v. Halvorsen*.[144] Admittedly, the text of *Olson* could be read to suggest that Section 18-604 would apply in this situation. On closer examination, however, it is clear that the Delaware Supreme Court did not reach the question presented by this case. Instead, the high court found that "the Viking founders never departed from the original 'cap and comp' agreement, and that they were not obligated to pay Olson an earn-out or the fair value of his interest in Viking."[145] Although the justices seemed to take the plaintiff at his word that Section 18-604 otherwise would apply, the court did not actually rule on that issue.

Shah did not resign voluntarily, making Section 18-604 inapplicable. No other provision in the LLC Act appears pertinent. In this situation, Section 18-1104 of the LLC Act states that "the rules of law and equity . . . shall govern."[146]

In the *Hillman* case, while a member of this court, Chief Justice Strine addressed a situation in which a limited partnership agreement did not specify the amount due to an expelled partner. Then-Vice Chancellor Strine concluded that Section 17-1105, the provision of the LP Act that is analogous to Section 18-1104, called for a payment equal

---

[143] *See Hillman v. Hillman*, 910 A.2d 262, 271-78 (Del. Ch. 2006) (Strine, V.C.).

[144] 986 A.2d 1150 (Del. 2009).

[145] *Olson*, 986 A.2d at 1163.

[146] 6 *Del. C.* § 18-1104.

32

to the fair value of the expelled partner's interest.[147] In reaching this conclusion, he relied in part on Section 15-701 of the Delaware Revised Uniform Partnership Act (the "Partnership Act"), which

> explicitly recognizes that after the expulsion of a partner, . . . the remaining partners may continue to operate the partnership business provided that a buyout payment is made to the expelled partner in an amount "equal to the fair value of such partner's economic interest as of the date of dissociation based upon such partner's right to share in distributions from the partnership" as required by § 15-701.[148]

He reasoned that Section 17-1105 called for the same result.[149]

In my view, the same analysis applies here. Applying this rule of law to the current case is all the more apt because the Company was a member-managed entity whose governance structure resembled a partnership. Under the LLC Act, "parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members."[150] One "attraction of the LLC form of entity is the statutory freedom granted to members to shape, by contract, their own approach to common business 'relationship' problems."[151] "Virtually any management structure may be

---

[147] *Hillman*, 910 A.2d at 276.

[148] *Id.* at 277 (quoting 6 *Del. C.* § 15-701(b)),

[149] *Id.*

[150] *Kuroda*, 971 A.2d at 880.

[151] *Haley v. Talcott*, 864 A.2d 86, 88 (Del. Ch. 2004) (Strine, V.C.).

implemented through the company's governing instrument."[152] Using this contractual

freedom, parties can create an LLC with bespoke governance features or design an LLC

that mimics the governance features of another familiar type of entity.

The choices that the drafters make have consequences. If the drafters have embraced

the statutory default rule of a member-managed governance arrangement, which has strong

functional and historical ties to the general partnership (albeit with limited liability for the

members), then the parties should expect a court to draw on analogies to partnership law.[153]

If the drafters have opted for a single managing member with other generally passive, non-

managing members, a structure closely resembling and often used as an alternative to a

limited partnership, then the parties should expect a court to draw on analogies to limited

partnership law.[154] If the drafters have opted for a manager-managed entity, created a board

---

[152] Symonds & O'Toole, *supra*, § 9.01[B], at 9-9.

[153] *See* 6 *Del. C.* § 18-402 (establishing the default rule that management of an LLC is "vested in its members in proportion to the then current . . . interest of members in the profits of the limited liability company owned by all of the members," with the decision of "members owning more than 50 percent of the said percentage or other interest in the profits controlling"); *Kelly v. Blum*, 2010 WL 629850, at *11 n.73 (Del. Ch. Feb. 24, 2010) (identifying parallel between member-managed LLC and partnership). As in a general partnership, the LLC Act's "default framework generally contemplates a unity of membership and management control." Symonds & O'Toole, *supra*, § 9.01[A][1], at 9-5.

[154] *See Kelly*, 2010 WL 629850, at *11 n.73. The field of limited partnership law offers particularly fertile comparisons, because the LLC Act was "modeled on the popular Delaware LP Act" and "its architecture and much of its wording is almost identical to that of the Delaware LP Act." *Elf Atochem*, 727 A.2d at 290. When a manager-managed entity has passive members, those members are often "treated much like a limited partner under the LP Act." *Id.*

34

of directors, and adopted other corporate features, then the parties to the agreement should expect a court to draw on analogies to corporate law.[155] Depending on the terms of the agreement, analogies to other legal relationships may also be informative.[156]

Domain employed a member-managed model, making it appropriate to draw on analogies to general partnership law. The default rule that applies for a partnership under Section 17-1105 logically applies here under Section 18-1104.

This outcome also finds support in another principle of Delaware law: "Delaware

---

[155] *See Kelly*, 2010 WL 629850, at *11 n.73 (suggesting corporate analogy for manager-managed LLC where operating agreement created board of managers similar to that of corporation); Symonds & O'Toole, *supra*, § 9.01[B], at 9-9 ("A limited liability company may be structured on the basis of a corporate model . . . ."); *see, e.g.*, *Fla. R & D Fund Inv'rs, LLC v. Fla. BOCA/Deerfield R & D Inv'rs, LLC*, 2013 WL 4734834, at *2, *7 (Del. Ch. Aug. 30, 2013) (addressing LLC agreement that created a board of directors to manage the entity); *Kahn v. Portnoy*, 2008 WL 5197164, at *4 (Del. Ch. Dec. 11, 2008) (interpreting LLC agreement which created board of directors to manage the entity and which provided that the "'authority, powers, functions and duties (including fiduciary duties)' of the board of directors will be identical to those of a board of directors of a business corporation organized under the Delaware General Corporation Law . . . unless otherwise specifically provided for in the LLC Agreement"); *In re Seneca Invs., LLC*, 970 A.2d 259, 261 (Del. Ch. 2008) (interpreting LLC agreement which provided that, subject to certain exceptions, "the Company will be governed in all respects as if it were a corporation organized under and governed by the Delaware General Corporation Law . . . and the rights of its Stockholders will be governed by the DGCL"); *see also Matthew v. Laudamiel*, 2012 WL 2580572, at *1 (Del. Ch. June 29, 2012) (interpreting LLC agreement that created board of managers to oversee business and affairs of entity); *VGS, Inc. v. Castiel*, 2003 WL 723285, at *2 (Del. Ch. Feb. 28, 2003) (same).

[156] *See JAKKS Pac., Inc. v. THQ/JAKKS Pac., LLC*, 2009 WL 1228706, at *2 (Del. Ch. May 6, 2009) (explaining that although a party to the LLC agreement at issue is "technically a member of the LLC," its economic interest "is less that of an equity owner and more akin to a licensor with rights to royalties based on sales").

law does not favor interpretations that result in forfeitures."[157] Section 18-1104 does not

> vary the fundamental principle under Delaware law that a majority of the members (or stockholders) of a business entity, unless expressly granted such power by contract, have no right to take the property of other members (or stockholders). Other mechanisms may be available to them to recast their business relations to eliminate persons from the enterprise, such as the merger provisions of the various business entity laws. But, these provisions do not provide for the forfeiture of economic rights, requiring instead that the persons whose interests are eliminated are entitled to receive fair value therefor.[158]

Shah was therefore entitled to receive the fair value of his interest.

When the plaintiffs forced Shah to withdraw from Domain, they did not pay him the fair value of his 12.1% membership interest. Instead, they paid him the value of his capital account, as if Article VII controlled. By forcing Shah to withdraw and not paying him the fair value of his member interest, the plaintiffs breached the LLC Agreement.

## B. Damages

As damages, Shah is entitled to the difference between the fair value of his member interest in the Company and the payment he received for his capital account. Both sides relied on expert testimony to establish the fair value of Shah's member interest. Both experts relied on the discounted cash flow ("DCF") methodology. Shah's expert, Carl S. Saba, opined that the fair value of Shah's member interest ranged from $4.299 million to

---

[157] *Milford Power Co., LLC v. PDC Milford Power, LLC*, 866 A.2d 738, 762 (Del. Ch. 2004) (Strine, V.C.); *see also Garrett v. Brown*, 1986 WL 6708, at *8 (Del. Ch. June 13, 1986); *Clements v. Castle Mortg. Serv. Co.*, 382 A.2d 1367, 1370 (Del. Ch. 1977); *Rehoboth Bay Marina, Inc. v. Rainbow Cove, Inc.*, 318 A.2d 632, 634 (Del. Ch. 1974).

[158] *Walker*, 791 A.2d at 815.

$6.067 million. Domain's expert, Yvette R. Austin Smith, opined that Shah's member interest had a fair value of approximately $531,000.

The difference between the experts' opinions results from disagreements over inputs. This decision calls the balls and strikes on those inputs. The parties shall revise Austin Smith's DCF model to reflect these rulings and submit the results to the court.

### 1.    The Projections

"The first key to a reliable DCF analysis is the availability of reliable projections of future expected cash flows."[159] Both experts started with Domain's management projections. Saba made significant modifications to the projections.

"Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations."[160] "When management projections are made in the ordinary course of business, they are generally deemed reliable."[161]

Domain prepared projections yearly, in the ordinary course of business, using a consistent process. The projections encompassed a ten-year forecast for Domain's future economic outlook.[162] The management projections in this case were not prepared for

---

[159] *In re Petsmart, Inc.*, 2017 WL 2303599, at *32 (Del. Ch. May 26, 2017).

[160] *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *5 (Del. Ch. May 20, revised June 10, 2004).

[161] *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *7 (Dec. 31, 2003), *aff'd in part, rev'd on other grounds*, 884 A.2d 26 (Del. 2005).

[162] *See* Kraeutler Tr. 273-74; Saba Tr. 569; Austin Smith Tr. 637-38.

37

purposes of litigation, in anticipation of a pending transaction, or under other circumstances that could undermine their reliability. Over the short term, Domain's projections were generally accurate.[163] Over the long term, Domain's projections were somewhat bullish, favoring Shah.[164]

Saba did not provide a persuasive justifications for his major alterations to the projections. Among other things, he accelerated the formation of Funds X and XI, ignoring the operative reality of Domain's recent fundraising experience.[165] This modification also ignored limitations in the fund documents for Fund IX that made it virtually impossible for Domain to form Fund X on the schedule Saba projected.[166] Saba's "lower quartile" analysis was likewise unpersuasive: it simply assumed Domain's management projections were too conservative.[167] Finally, Saba's management fee projections kept the fees at 2% over the ten-year life of a fund, rather than accounting for the provisions in the fund documents that reduced management fees in years six through ten.

On other, less significant issues, Saba made a persuasive case. First, the DCF model will include the director fees that Company members received for serving on the boards of

---

[163] JX 271 ¶ 48; Saba Tr. 491.

[164] *See generally* DX 8.

[165] JX 271 at ¶ 79; Saba Tr. 493.

[166] *See* JX 336 § 9.02; Saba Tr. 582-84.

[167] JX 271 ¶ 111.

portfolio companies. Although Domain customarily allows its members to keep the fees, they are revenue for the Company.[168]

Second, the DCF model will include "Fund GP Interest Net Distributions." These amounts reflect the cash and stock distributions that the Company receives from its ownership in the investment funds, net of its initial capital contribution.[169] This calculation accounts for the fact that members of the Company participate in the OPSA entities whenever new funds are formed. As a member of the Company, Shah enjoyed that right to participate in future OPSA entities, which he lost as a result of his removal.[170] If Shah had remained a member of the Company, he would have received additional cash flows equal to 12.1% of these distributions.

Third, the DCF model will include "Gains on Securities." This item reflects securities in underlying portfolio companies that the Company received. The Company reported these securities as a source of income on its income statements and as assets on its balance sheet.[171] Reflecting the members' beneficial ownership of these securities, the Company regularly distributed them to its members.[172] Shah had an 11.94% interest in "Post 12/31/14 Securities," a 12.1% interest in "Post 12/31/15 Securities," and an 11.8%

---

[168] *See* JX 193 DA_1044142.

[169] JX 271 ¶ 86; *see also* JX 292.

[170] Saba Tr. 619.

[171] *Id.* 497-98.

[172] *See* JX 245; JX 271 ¶¶ 85-86; JX 320.

interest in all "Guaranteed Distributions."[173] If Shah had remained a member, he would have received the value of these interests. Saba's projection of 8% of revenue as a proxy for gains on securities is a reasonable and conservative estimate that the parties will incorporate into the DCF model.

Fourth, the DCF model should not include "OPSA and Related Tax Draws" as operating expenses. Domain announced that it would stop paying OPSA draws in 2015.[174] Going forward, they would no longer be operating expenses of the Company.

Fifth, the DCF model should not include projected revenue from the extension of Fund VII. That fact was not known or knowable as of April 18, 2016, the date of Shah's removal from the Company, which is the valuation date. The same analysis applies to the increase in the size of Fund IX, which occurred after Shah's removal.

Finally, the DCF model will not be adjusted to treat 25% of each member's compensation as Company profit. Saba justified making this adjustment based on Shah's statement his "job responsibilities were essentially identical" before and after becoming a member.[175] This is not a convincing reason to modify the management projections.

### 2.    The Perpetuity Growth Rate

The DCF model will use a perpetuity growth rate to extend the model beyond the projection period. "Generally, once an industry has matured, a company will grow at a

---

[173] PTO ¶ 17.

[174] *See* JX 123; JX 143 at DA_0001941.

[175] Saba Tr. 495.

40

steady rate that is roughly equal to the rate of nominal GDP growth."[176] When applying a

perpetuity growth rate, "the rate of inflation is the floor for a terminal value estimate for a

solidly profitable company that does not have an identifiable risk of insolvency."[177]

Austin Smith did not apply a perpetuity growth rate, but her explanation was not

convincing.[178] Her model projected that Domain would continue operating, without

winding down, going insolvent, or dipping into cash reserves.[179] She offered no reason to

anticipate business failure. Saba used a reasonable perpetuity growth rate of 3%.[180] This

decision adopts it.

### 3. The WACC

The experts disagreed over three inputs when calculating the weighted average cost

of capital ("WACC"): (i) whether to use a company-specific risk premium of 2% or 3%,

(ii) whether to add 0.6% for liquidity risks, and (iv) beta.

Both experts said they used a 3% company-specific risk premium, but Saba actually

used a 2% premium.[181] Whether to include "a company specific risk premium 'remains

---

[176] *Glob. GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 511 (Del. Ch.) (Strine, V.C.), *aff'd*, 11 A.3d 214 (Del. 2010).

[177] *Id.* at 511.

[178] *See* JX 298 ¶ 42.

[179] *See* Austin Smith Tr. 758-59.

[180] *See* JX 283; Austin Smith Tr. 670.

[181] *Compare* JX 271 ¶ 108 *with* JX 271 ¶ 109. *See also* JX 316 (noting that the 3% company specific risk premium was a typographical error).

41

largely a matter of the analyst's judgment, without a commonly accepted set of empirical support evidence.'"[182] One can question the subjectivity of this approach, but both experts used it here, and both experts said that a 3% premium should be added. Saba did not explain how he ended up using a 2% premium, except to say it was a typographical error.[183] This decision adopts the 3% premium that both experts said should apply.

Austin Smith added an additional 0.6% premium to her WACC to account for "liquidity risks," citing Domain's sector concentration and its aging management team.[184] I cannot discern any reason for treating these risks as distinct from other company-specific risks. The additional 3% is already a healthy increase. The parties will not tack on any additional percentage for other liquidity risks.

The experts also disagreed about beta. Saba analyzed the Company's peers to generate a beta of 1.28.[185] Austin Smith criticized the peers he used,[186] but only suggested eliminating Oaktree Capital Management.[187] "If an expert witness clearly and persuasively

---

[182] *Hintmann v. Fred Weber, Inc.*, 1998 WL 83052, at *5 (Del. Ch. Feb. 17, 1998) (quoting Shannon P. Pratt, et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 164 (3d ed. 1996)).

[183] JX 316.

[184] JX 298 ¶ 58; Austin Smith Tr. 660-62.

[185] JX 279.

[186] JX 298 ¶ 57 (noting Apollo Global Management was listed as comparable company, but had $170 billion assets under management and 49% of assets in "permanent capital vehicles"); Austin Smith Tr. 655-57.

[187] JX 298 ¶ 59.

explains why he or she has included or omitted an outlier from his or her data set, I have more confidence that the expert witness's data set is less likely to lead to a biased or skewed valuation."[188] But when a party does not justify the use of the companies it selected as comparable, the court will not accord weight to the analysis.[189] Oaktree Capital appears to be an outlier,[190] and Saba never justified its inclusion. Austin Smith likely could have argued persuasively for excluding other peer companies as well, but she did not take that step. The parties will re-calculate beta without Oaktree Capital and use that value.

### 4.    Cash On Hand

Excess cash on hand is a non-operating asset that should be added after a DCF valuation has been performed.[191] The Company has accumulated a massive cash balance, which Austin Smith argued was necessary to fund future cash deficits.[192] That argument was not convincing. Austin Smith's model projects that the Company will maintain a positive cash flow.[193] From my review of the record, it appears to me that the Company's

---

[188] *Hanover Direct, Inc. S'holder Litig.*, 2010 WL 3959399, at *2 (Del. Ch. Sept. 24, 2010).

[189] *See Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *7, 18 (Del. Ch. July 8, 2013).

[190] *See* JX 279.

[191] *See, e.g.*, *In re AOL Inc.*, 2018 WL 1037450, at *20 (Del. Ch. Feb. 23, 2018); *Owen v. Cannon*, 2015 WL 3819204, at *17 (Del. Ch. June 17, 2015); *In re Trados Inc. S'holder Litig*, 73 A.3d 17, 74 (Del. Ch. 2013).

[192] JX 298 ¶ 61.

[193] *See* JX 305-06.

members anticipate using the cash to smooth out their compensation. In other words, the cash is earmarked (albeit not formally so) for the members.

Saba handled the cash on hand persuasively. He started with the cash balance as of December 31, 2015, then subtracted three months of operating expenses, leaving $7,533,000 in excess cash. As of April 18, 2016, the cash balance had grown to $12.8 million in cash on hand.[194] To determine fair value, the parties will subtract Saba's estimate of three months of operating expenses from the cash on hand as of April 18, 2016. The remaining amount will be added to the Company's value as excess cash.

## C. The Individual Members Are Liable For Breach of Contract.

The plaintiffs contend that only the Company is liable for any damages award. Shah contends that the individual plaintiffs are also jointly and severally liable. On the facts of this case, Shah is correct.

Generally speaking, a party to a contract is liable when it engages in breach. That is true for operating agreements, just as it is true for other contracts.[195] In this case, the individual plaintiffs were members of the Company and parties to the LLC Agreement; they were bound by its terms. Through their votes as members, they expelled Shah from the Company, giving rise to the obligation to pay him the fair value of his member interest.

---

[194] Saba Tr. 508; Austin Smith Tr. 756-57.

[195] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 141 n.30 (Del. Ch. 2004) (Strine, V.C.) (noting that Section 18-303 does not protect members from liability to other members, including liability for breaching the LLC agreement).

They breached that obligation by failing to pay him the amounts he was due, while at the same time they each benefitted proportionately for the elimination of his interest.[196] It follows that the individual plaintiffs are liable, jointly and severally with each other and the Company, for their breach of the LLC Agreement.

To resist this outcome, the remaining members cite Section 18-303 of the LLC Act. Titled "Liability to third parties," it states:

> (a) Except as otherwise provided by this chapter, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company.
>
> (b) Notwithstanding the provisions of subsection (a) of this section, under a limited liability company agreement or under another agreement, a member or manager may agree to be obligated personally for any or all of the debts, obligations and liabilities of the limited liability company.[197]

The plaintiffs point out that in the LLC Agreement, the members did not "agree to be obligated personally for any or all of the debts, obligations and liabilities of the limited liability company."

---

[196] *See* JX 321 at 3; Blair Tr. 219-20 (Q. Mr. Blair, on the morning of April 18, 2016, you owned 15.51 percent of a business which had made $12 million the year before. Isn't that correct? A. Yes . . . . Q. And then you went to a meeting and you voted six to one and you went to bed that night and you owned 17.65 percent of Domain. Isn't that right? A. Yes.)

[197] 6 *Del. C.* § 18-303.

The liability to Shah is not a liability to a third party. It is a liability to a member who has been eliminated from the Company through actions taken by his fellow members. The liability to Shah is also not a liability of the Company. If Article VII had provided expressly for the Company to pay Shah the value of his capital account, and the Company simply refused to pay it, then the contention that the payment obligation was a liability of the Company would be much stronger. But here, the LLC Agreement does not create an obligation on the part of the Company to pay Shah. The LLC Agreement is silent, and the breach arises under the default provisions of the LLC Act.

Moreover, as noted, the remaining members were not passive actors or so uninvolved in the Company's management such that holding them liable for breach of contract is unwarranted. If, for example, the Company had a true managing member that had made all of the decisions regarding Shah's forced withdrawal while the remaining members remained passive spectators, then again their argument would be stronger. But here, the remaining members acted by voting for Shah's removal and then determining what positions to take regarding what Shah would be paid. Those actions and positions resulted in a breach of the LLC Agreement. The remaining members are jointly and severally liable with the Company for the damages arising out of that breach.

## D.    Fee Shifting

Shah requests that this court shift his fees to Domain because Domain conducted this litigated in bad faith. In turn, Domain argues that Shah's application for fees is itself

in bad faith and that this court should shift its fees for briefing this part of the argument.

Delaware follows the American Rule, which generally requires that, "regardless of the outcome of litigation, each party is responsible for paying his or her own attorneys' fees."[198] "The bad faith exception to the American Rule applies in cases where the court finds litigation to have been brought in bad faith or finds that a party conducted the litigation process itself in bad faith, thereby unjustifiably increasing the costs of litigation."[199] An unwarranted motion for fee shifting under the bad faith exception can itself justify a finding of bad faith and fee shifting.[200]

I have considered the parties' conduct, both during the pre-litigation phase and in the litigation itself. During the pre-litigation phase, there is plenty of blame for both sides to share. Shah did not act forthrightly or openly towards Domain, and the Domain principals ultimately became exasperated and gave Shah only what they thought they absolutely had to provide. Neither side acted commendably. Both sides acted within their legal rights. During the litigation, both sides litigated vigorously. Shah's litigation team

---

[198] *In re SS & C Techs., Inc. S'holders Litig.*, 948 A.2d 1140, 1149 (Del. Ch. 2008).

[199] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850-51 (Del. Ch. 2005) (Strine, V.C.).

[200] *New Castle Shopping, LLC v. Penn Mart Disc. Liquors, Ltd.*, 2009 WL 5197189, at *2 (Del. Ch. Oct. 27, 2009) (noting that an unwarranted request for sanctions can itself be the basis for sanctions); *see Wilkerson v. Harleysville Mut. Auto. Ins. Co.*, 1993 WL 144593, at *3 (Del. Ch. Apr. 23, 1993) (denying a motion for sanctions as being "without merit—a circumstance that is perilously close itself to being a violation of Rule 11"); *see also Local 106, Serv. Empls. Int'l Union v. Homewood Mem'l Gardens, Inc.*, 838 F.2d 958, 961 (7th Cir. 1988) (affirming district court's *sua sponte* grant of sanctions for filing an unwarranted motion for sanctions.).

was more pugnacious and provocative. The Domain litigation team showed more civility, but their positions evolved as the litigation progressed. In my view, this is not a case where fee shifting is warranted. Nor was Shah's motion unfounded.

## III.    CONCLUSION

The defendants breached the LLC Agreement by failing to pay Shah the fair value of his member interest when removing him from the Company. As a remedy, Shah is entitled to the fair value of his member interest, which the parties shall calculate in accordance with this decision. Shah is also entitled to pre- and post-judgment interest calculated at the legal rate, compounded quarterly, and running from April 18, 2016, to the date of payment, with the rate of interest fluctuating with changes in the legal rate.[201] He is also entitled to costs as a prevailing party.

Within thirty days, the parties shall submit a joint letter providing the final calculation of Shah's damages. The parties also shall identify any other matters that the court needs to address to bring this matter to a conclusion at the trial level.

---

[201] *See* 6 *Del. C*. § 2301(a); *Levey*, 2014 WL 4290192, at *1 (explaining rationale for fluctuating rate); *Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *13 (Del. Ch. July 25, 2003) (using quarterly compounding interval for legal rate "due to the fact that the legal rate of interest most nearly resembles a return on a bond, which typically compounds quarterly").