# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| HARRY GREENHOUSE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 2018-0214-JRS** |
| | : | |
| POLYCHAIN FUND I LP and POLYCHAIN 2030, LLC, | : | |
| | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Date Submitted: February 25, 2019
Date Decided: May 29, 2019

Joseph H. Huston, Jr., Esquire and Stacey A. Scrivani, Esquire of Stevens & Lee, P.C., Wilmington, Delaware and Todd C. Toral, Esquire and AnnaMarie A. Van Hoesen, Esquire of Jenner & Block LLP, Los Angeles, California, Attorneys for Plaintiff.

Jeffrey M. Gorris, Esquire and Christopher P. Quinn, Esquire of Friedlander & Gorris, P.A., Wilmington, Delaware and J. Noah Hagey, Esquire and Taylor Altman, Esquire of Braunhagey & Borden LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

This action involves a demand by Plaintiff, Harry Greenhouse, to inspect the books and records of Defendant, Polychain Fund I LP ("Polychain" or the "Fund"), under Delaware Revised Uniform Limited Partnership Act ("DRULPA") Section 17-305.[1]  Plaintiff purportedly seeks to inspect Polychain's books and records for the purpose of investigating the value of his capital account and the amount paid to him upon his withdrawal from the partnership.  At first glance, the demand and its purpose appear proper enough.  But Plaintiff has a standing problem. When he withdrew from Polychain, he ceased being a limited partner and lost standing to demand inspection of Polychain's books and records.

Plaintiff resists the premise of lost standing by pointing to the fact that Polychain withheld 5% of his redemption upon withdrawal as an audit holdback and then later provided him with an additional cash distribution based on assets that could not be valued at the time of his investment.  Neither the holdback nor the cash distribution reflects equity in the firm, however, because they do not reflect an interest that rises or falls with the value of the Fund.  They are, instead, discrete obligations and rights unique to Plaintiff in his capacity as a redeemed member. Because Plaintiff no longer possesses an equity interest in Polychain, he has no statutory or contractual right to inspect its books and records.

---

[1] 6 *Del. C.* § 17-305.

Polychain has moved for judgment on the pleadings. According to Polychain, the facts as admitted by Plaintiff demonstrate, as a matter of law, that Plaintiff is no longer a limited partner with rights to inspect the partnership's books and records. For the reasons explained below, I agree. The motion for judgment on the pleadings is granted.

## I. BACKGROUND

The facts are drawn from the well-pled allegations in the complaint and documents incorporated by reference, including Polychain's limited partnership agreement (the "LPA") and correspondence by and between Plaintiff and Polychain.[2] I have afforded Plaintiff all reasonable inferences, as I must on a motion for judgment on the pleadings.[3]

### A. Parties and Relevant Non-Parties

Defendant, Polychain, is a Delaware limited liability company. It is a fund comprising a portfolio of blockchain assets that includes digital currencies and

---

[2] *See Credit Suisse Sec. (USA) LLC v. W. Coast Opportunity Fund, LLC,* 2009 WL 2356881, at *3 (Del. Ch. July 30, 2009) (noting, on a motion for judgment on the pleadings, "[t]he Court may consider the unambiguous terms of exhibits attached to the pleadings and those incorporated into them by reference").

[3] *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1205 (Del. 1993) (noting, on a motion for judgment on the pleadings, "a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party"); *Graulich v. Dell,* 2011 WL 1843813, at *4 (Del. Ch. May 16, 2011) ("In ruling on a motion for judgment on the pleadings, the Court must take the well-pled facts alleged in the complaint as true . . . .").

2

"Simple Agreements for Future Tokens" ("SAFTs").[4] Defendant, Polychain 2030, LLC, is Polychain's current general partner.[5] Nonparty, Polychain Capital LP ("Polychain Capital"), was the general partner of the Fund at the time of Plaintiff's withdrawal from the partnership.[6] Plaintiff, Harry Greenhouse, claims to be a limited partner of Polychain.[7]

## B. Plaintiff Redeems His Interest in Polychain

On November 13, 2017, Polychain Capital requested that the limited partners consent to, among other things, the designation of "side pockets" for certain of the Fund's investments, including SAFTs.[8] Limited partners were told that if they did

---

[4] Compl. ¶¶ 3, A. 1. Because the complaint uses paragraph numbers 1–5 twice, references to the second set of paragraphs 1–5 are indicated with the preface "A," the letter of the subheading under which the paragraphs appear in the Complaint.

[5] Compl. ¶ 4.

[6] Compl. ¶ A. 3.

[7] Compl. ¶¶ 5, 30.

[8] Compl. ¶¶ 11–12. A "side pocket" is a type of account used by hedge funds to separate illiquid, hard-to-value assets from liquid assets. *See* Henry Ordower, *Demystifying Hedge Funds: A Design Primer*, 7 U.C. Davis Bus. L.J. 323, 328 (2007). Funds treat side pocket accounts in various ways depending on the fund's investment goals and the nature of the assets placed in the accounts: "(i) some funds estimate the value of side pocket positions and include a payment for them in the redemption price; (ii) more often, funds permit investors to redeem the liquid portion of their interests but retain the investor in the fund with respect to the investor's share of illiquid positions; (iii) other funds exclude side pocket value from the redemption proceeds for investors wishing to redeem from the fund before the illiquid positions are sold, so that the redeeming investor simply relinquishes any interest in the side pocket; (iv) in order to avoid harsh results, managers occasionally create a separate class of fund interests with some investors only sharing in the liquid

not provide their consent by November 30, 2017, they would be withdrawn from the partnership as of December 31, 2017.[9]

Two weeks later, on November 27, 2017, Plaintiff notified Polychain Capital that he intended to make a full redemption of his capital account.[10] He alleges that he based this decision on assurances from Joseph Eagan, Polychain Capital's Chief Operating Officer, that the Fund's most liquid assets would be valued for redemption at prices as of December 31, 2017, and that there would be a framework to value less liquid assets.[11] Eagan also stated that the illiquid assets would be placed in side pockets and excluded from the redemption until they were deemed to be liquid by Polychain Capital.[12] Two days after Plaintiff determined to withdraw, Polychain Capital's chief of staff, Caroline Jaquiss, informed Plaintiff that his redemption would be valued "under the old terms," and that no assets would be side-pocketed.[13]

Over the next few weeks, Plaintiff attempted to obtain more information regarding the valuation of his redemption. On December 13, 2017, an email from

---

positions in the fund's portfolio, while others, with a longer-term appetite for commitment, participate in the side pocket portion of the fund as well." *Id.*

[9] Compl. ¶ 12.

[10] Compl. ¶ 15.

[11] Compl. ¶¶ 10, 14–15.

[12] Compl. ¶ 14.

[13] Compl. ¶¶ 7, 16.

4

counsel for Polychain Capital, Karl Cole-Frieman, to Greenhouse largely confirmed Eagan's prior assurances concerning the valuation procedures.[14] Because Plaintiff requested full withdrawal before Polychain had designated any side pockets, however, Polychain Capital determined that his redemption would be valued without the benefit of excluding less liquid assets from the valuation process until their liquidity improved.[15]

In the following weeks, counsel for Plaintiff sought information regarding the valuation policy but was told the policy would not be disclosed.[16] Hoping to reach an agreement on the side pockets or at least on a more beneficial procedure for valuing Plaintiff's interests, Plaintiff's counsel requested on December 26, 2017, that Polychain suspend Plaintiff's redemption request.[17] Polychain refused.[18]

On January 25, 2018, Plaintiff received an investor statement indicating that his account had been fully redeemed; four days later, he received and accepted a

---

[14] Compl. ¶ 17; Compl., Ex. D (email from Cole-Frieman, dated December 13, 2017, explaining that all assets would be priced as of December 31, 2017, certain less liquid assets would be priced at fair market value as determined in Polychain's discretion and others would continue to be held at cost).

[15] *Id.*

[16] Compl. ¶¶ 18, 19; Compl., Ex. E.

[17] Compl. ¶ 20; Compl., Ex. F.

[18] Compl. ¶ 21; Compl., Ex. G.

wire transfer for the withdrawal.[19]  Polychain withheld 5% of Plaintiff's capital account as an audit holdback per the LPA.[20]

### C. The Books and Records Demand

Section 10.2 of the LPA permits the Fund's limited partners to inspect the books and records of the partnership as provided under DRULPA.[21]  After his repeated efforts to obtain information through other means failed to yield results, on February 28, 2018, Plaintiff finally made a written demand to inspect Polychain's books and records under Section 17-305.[22]  The demand seeks all books and records from the time Plaintiff first invested to the date of his demand relating to:

    a.  Any assets held by Polychain;

    b.  Any transactions Polychain consummated with any person, entity, and/or investee, regarding any assets held by Polychain, including, without limitation, any SAFT entered into with any enterprise;

    c.  Any performance, management, or consulting fees and their calculation paid by Polychain to anyone, including the General Partner;

---

[19] Compl. ¶ 22.

[20] *Id.*; Compl., Ex. A ("LPA") § 8.04 ("[T]he General Partner shall have the right, at its discretion, to withhold 5% of the net asset value of the withdrawn Capital Account for the Partnership's liabilities and other contingencies until no later than 30 days after the completion of the year-end audit of the Partnership's financial statements  . . . .").

[21] LPA § 10.02.

[22] Compl. ¶ 26; Compl., Ex. J.

d. The mathematical methodology used in respect of Mr. Greenhouse's account statements and/or redemption;

e. Any side deals or binding side letters Polychain and/or the General Partner entered into with any person, including, without limitation, any limited partner, if such side deals or letters affected or could have possibly affected the value of Mr. Greenhouse's interest in Polychain; and

f. Any agreements or engagements with any third parties (paid or otherwise) that might have affected the treatment of Mr. Greenhouse's interest or its value.[23]

## D. Procedural Posture

When Polychain failed to respond to his demand,[24] Plaintiff filed his Verified Complaint for Inspection of Partnership Books and Records (the "Complaint") on March 26, 2018. On June 1, 2018, the Court stayed the action pending a determination of arbitrability by an appointed arbitrator.[25] On October 22, 2018, a JAMS arbitrator determined that Plaintiff's books and records action should be adjudicated in this Court.[26] Defendants answered the Complaint on May 11, 2018,[27]

---

[23] *Id.*

[24] Compl. ¶ 28.

[25] D.I. 46.

[26] D.I. 47.

[27] D.I. 49.

and moved for judgment on the pleadings the following day.[28]  The motion was submitted to the Court on February 25, 2019.

## II. ANALYSIS

Defendants contest Plaintiff's standing to inspect Polychain's books and records.  They argue that because Plaintiff has withdrawn from the partnership and fully redeemed his partnership interest, he is no longer a limited partner.  Instead, at most, Plaintiff is now a creditor of the Fund and, in that capacity, he no longer possesses inspection rights.  Plaintiff counters that he continues to hold an equity interest in Polychain because his withdrawal was partial and involuntary.  He contends that Polychain redeemed him over his objection, withheld 5% of his interest as an audit holdback and later gave him a cash distribution based on assets in which he continued to have an interest after his redemption.

Plaintiff's arguments in support of his standing to seek inspection are unpersuasive.  The law is clear that only current limited partners can inspect books and records.  Unless the partnership agreement provides otherwise, limited partners who have withdrawn from the partnership have rights and remedies as creditors of the partnership but no longer maintain an equity interest that would entitle them to rights as limited partners.  The Complaint does not allege that Plaintiff resisted

---

[28] D.I. 52.

Polychain's refusal to suspend his withdrawal from the partnership or that he sought to return the distribution of his capital account when he received it. His arguments in briefing and at oral argument—that he did not want to be redeemed and, in fact, continues to have a small ongoing equity interest based on the audit holdback and assets that yielded a subsequent cash distribution—do not change the fact that he has withdrawn from the partnership and no longer has rights as a limited partner. Because he no longer retains an equity interest in the partnership, he is not entitled to inspect the partnership's books and records.[29]

---

[29] Because I have determined Plaintiff has no standing to compel inspection, I need not address Defendants' argument that Plaintiff is disqualified from seeking inspection because he can obtain the documents in the arbitration proceeding pending between the parties. I do note, however, that the concerns that animate the cases Defendants cite are not present here where *Defendants* initiated the arbitration against Plaintiff *after* he had initiated this books and records action. *See CHC Invs., LLC v. FirstSun Capital Bancorp*, 2019 WL 328414, *2 (Del. Ch. Jan. 24, 2019) (explaining that simultaneous "plenary and [books and records] complaints are inherently contradictory" because plaintiff represents, in the former, that it has sufficient information to support its allegations, while representing, in the latter, that it requires information to support its plenary claims; and also addressing the concern in this context that plaintiff will abuse the inspection right as a means to end-run discovery laws); *Cent. Laborers Pension Fund v. News Corp.*, 2011 WL 6224538 (Del. Ch. Nov. 30, 2011) (denying inspection where plenary court had not positively granted leave to amend); *Beiser v. PMC-Sierra*, 2009 WL 483321 (Del. Ch. Feb. 26, 2009) (denying inspection where the only purpose was to access records that would not have been available through discovery in the plenary action); *W. Coast Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636, 641 (Del. Ch. 2006) (denying inspection where court in plenary action had dismissed complaint without leave to amend); *King v. Verifone*, 12 A.3d 1140 (Del. 2011) (permitting inspection where court in plenary action had granted plaintiff leave to amend).

## A. Standard of Review

Under Court of Chancery Rule 12(c), judgment on the pleadings will be granted "if the pleadings fail to reveal the existence of any disputed material fact and the movant is entitled to judgment as a matter of law."[30] In making a determination on a motion for judgment on the pleadings, "the Court must take the well-pled facts alleged in the complaint as true, and view 'the inferences to be drawn from such facts in a light most favorable to the non-moving party.'"[31] But the Court need not "blindly accept as true all allegations, nor must it draw all inferences from them in [the non-moving party's] favor unless they are reasonable inferences."[32]

## B. Plaintiff Lacks Standing to Inspect Polychain's Books and Records

Plaintiff brings this action under 6 *Del. C.* § 17-305, which governs the rights of limited partners to inspect books and records of the limited partnership in which they are invested. Central to the statute is the refrain that the inspection right belongs to current limited partners. As the statute makes clear, "[e]ach **limited partner** has the right . . . to obtain from the general partners . . . for any purpose reasonably related to the **limited partner's** interest as a **limited partner**" certain books and

---

[30] *W. Coast Mgmt.*, 914 A.2d at 641; *see also Graulich*, 2011 WL 1843813, at *4 (same).

[31] *W. Coast Mgmt.*, 914 A.2d at 641 (quoting *Meades v. Wilm. Hous. Auth.*, 2003 WL 939863, at *2 (Del. Ch. Mar. 6, 2003)).

[32] *McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000) (quoting *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999)).

records; if the demand is made by an attorney or agent, it must be accompanied by a writing that "authorizes the attorney . . . to so act on behalf of the **limited partner**"; if the limited partnership does not respond to the demand, "the **limited partner** may apply to the Court of Chancery for an order to compel such disclosure" of books and records if "the **limited partner** shall first establish: (1) that the **limited partner** has complied with the provisions of this section respecting the form and manner of making demand for obtaining such information, and (2) that the information the **limited partner** seeks is reasonably related to the **limited partner's** interest as a **limited partner**."[33]  By reiterating that the statutory right of inspection belongs to limited partners and limited partners only, the statute implicitly eliminates any claim for inspection that other constituents of the partnership may seek to bring.

As Defendants point out, the language in Delaware's statute differs from the inspection rights afforded in the Revised Uniform Limited Partnership Act ("RULPA").[34]  RULPA Section 304(e), entitled "Rights to Information of Limited Partner and Person Dissociated As Limited Partner," provides for "a person dissociated as a limited partner" to "have access to information to which the person

---

[33] 6 *Del. C.* §§ 17-305(a) – (d) (emphasis supplied).

[34] *See* RULPA § 304; *see also, Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 714 A.2d 96, 101–02 (Del. Ch. 1998) (chronicling the legislative history of 6 *Del. C.* 17-305 and noting its departure from RULPA generally, and RULPA § 304 specifically).

was entitled while a limited partner" if certain conditions are met.[35] Section 17-305, on the other hand, affords no comparable right to former limited partners to inspect a partnership's books and records.

The notion that inspection rights belong only to ongoing equity participants in the limited partnership is reinforced by Section 18-305 of the Delaware Limited Liability Company Act and Section 220 of the Delaware General Corporation Law.[36] Under Section 18-305, inspection rights are provided to "[e]ach member of a limited liability company."[37] Similarly, under Section 220, as a predicate to inspection, stockholder plaintiffs must prove they own stock in the corporation whose records

---

[35] RULPA § 304(e); *see also* § 304, cmt. ("[the RULPA] builds on predecessor law by . . . providing access rights for former limited partners.").

[36] 6 *Del. C.* § 18-305; 8 *Del C.* § 220; *see also Gotham P'rs,* 714 A.2d at 101 (explaining that modifications to § 17-305 were intended "to inject a special proceeding equivalent to § 220 into the limited partnership's statutory scheme" and noting the "strikingly similar" language).

[37] 6 *Del. C.* § 18-305(a); *see also Prokupek v. Consumer Capital P'rs LLC*, 2014 WL 7452205, at *7 (Del. Ch. Dec. 30, 2014) ("By its plain language, Section 18-305(a) of the LLC Act confers inspection rights only on current members of an LLC.").

they wish to inspect,[38] and former directors are not entitled to inspect books and records of a corporation on whose board of directors they no longer serve.[39]

Of course, the LPA could have provided for different inspection rights than those granted under Section 17-305,[40] but that did not happen here. To the contrary, the LPA states, "Limited Partners shall be permitted to inspect the books and records of the Partnership as provided under [the DRULPA]."[41]

Plaintiff offers no meaningful counter to the proposition that former limited partners are not entitled to inspect books and records of the partnership. He argues, instead, that standing should be determined as of the date the inspection demand is delivered to the partnership as opposed to the date the Complaint is filed. This distinction, even if significant, does not help Plaintiff for the simple reason that he was not a limited partner of Polychain at either time. Plaintiff was fully redeemed

---

[38] 8 *Del C.* §§ 220(a), (c); *see also Weingarten v. Monster Worldwide, Inc.*, 2017 WL 752179, at *5 (Del. Ch. Feb. 27, 2017) (dismissing plaintiff's inspection demand where he did not "first establish" that he was a stockholder at the time he filed his complaint).

[39] 8 *Del C.* § 220(d); *see also Jacobson v. Dryson Acceptance Corp.*, 2002 WL 75473, at *4 (Del. Ch. Jan. 9, 2002) (finding removed director did not have standing to pursue his claim under Section 220(d)).

[40] *See* 6 *Del. C.* § 17-305(f).

[41] LPA § 10.02.

13

at least as of January 29, 2018, roughly one month before he delivered his formal inspection demand and two months before he filed his Complaint.

"Under the [DRULPA], once a partner withdraws, the partner becomes 'simply a contract claimant holding fixed rights,' and can sue in contract for failure to pay the value of its share as of the withdrawal date."[42]  Once Plaintiff became entitled to a distribution of his capital account, his rights and remedies with respect to the partnership were those of a creditor, and his rights to inspect the Fund's books and records were terminated:

> Books and records rights . . . are designed, for the most part, statutorily to allow someone who is an ongoing equity participant in an enterprise to seek out information relevant to its voting decisions and other things. By becoming a redeeming member, you are down to the rights you have as a redeeming member . . . .[43]

In the Complaint, Plaintiff repeatedly characterizes himself as a redeemed partner.[44]  Though he pleads that he requested a suspension of his redemption, he

---

[42] *Schuss v. Penfield P'rs, L.P.*, 2008 WL 2433842, at *4 (Del. Ch. June 13, 2008) (quoting *Hillman v. Hillman*, 910 A.2d 262, 278 (Del. Ch. 2006)); *see also* 6 *Del. C.* § 17-606(a) ("[U]nless otherwise provided in the partnership agreement, at the time a partner becomes entitled to receive a distribution, he or she has the status of, and is entitled to all remedies available to, a creditor of the limited partnership with respect to the distribution.").

[43] *TowerHill Wealth Mgmt. LLC v. The Bander Family P'ship LP*, C.A. No. 3830-VCS, 41–42 (Del. Ch. Aug. 22, 2008) (TRANSCRIPT); *see also Gotham P'rs*, 714 A.2d at 102 (noting the purpose of information rights for limited partners and stockholders is "to protect their financial stake in the entity").

[44] *See, e.g.*, Compl. ¶ 15 ("Mr. Greenhouse notified Polychain by email that he wanted to make a full redemption of his capital account."); ¶ 22 ("Mr. Greenhouse received an investor statement dated December 31, 2017, indicating that his capital account for

14

acknowledges that Polychain denied that request and he has not sought to challenge that decision here or elsewhere. If Plaintiff actually thought Polychain had wrongfully refused the suspension, he would have sent back the wire transfer of his redeemed funds and challenged the refusal. Instead, he accepted the wire transfer and thereafter acted as if he had been redeemed.[45] While Plaintiff challenges the valuation of his redemption, he makes no claims that the redemption itself was ineffective, that it was for anything less than his full capital account or that the valuation is based on an ongoing equity interest in the Fund.

Notably, at oral argument, Plaintiff did not rely on the pleadings to support his purported ongoing equity interest, choosing instead to focus entirely on the implications of two newly introduced documents. While Defendants were right to challenge Plaintiff's late reliance upon unpled facts, I need not address the objection because the unpled facts do not change the calculus.[46] The new documents—a distribution letter with a transmittal email and a wire transfer, both from Polychain—

---

Polychain had been redeemed."); ¶ 23 ("Despite his repeated requests, at no time did Mr. Greenhouse receive explanation for, or documentation regarding, the contents or valuation of his redemption . . . . Mr. Greenhouse has no way to accurately evaluate the interest which was the subject of the redemption . . . . Mr. Greenhouse is informed and believes that certain assets were improperly valued at cost, and that his redemption was therefore significantly undervalued."); ¶ 24 ("Mr. Greenhouse sent a request to Mr. Carlson-Wee in connection with his redemption . . . .").

[45] Compl. ¶ 22.

[46] *See* Oral Arg. Tr. on Defs.' Mot. for J. on the Pleadings ("Tr.") (D.I. 74) 38–39, 43–44.

15

merely confirm Plaintiff's status as a *former* limited partner. The salutation for the email and letter both read, "Dear former investor"; the body of the email explains that the letter concerns "a cash distribution resulting from [Plaintiff's] former investment," and refers to Plaintiff's "former investment" two more times; and the distribution letter states, "[s]ince your balance was fully redeemed as of December 31, 2017 . . . ."[47] On the face of these documents, it is difficult to accept Plaintiff's argument that they somehow support the notion that he continues to have an ongoing equity interest in Polychain.

More than their reference to Plaintiff's status as a former investor, the documents reveal in content and purpose that Plaintiff is no longer a limited partner of Polychain. Plaintiff argues that the cash distribution evidences an ongoing interest in a side pocket account that existed after his redemption.[48] But Defendants correctly respond that the cash distribution is in satisfaction of what was owed to Plaintiff as of December 31, 2017. Indeed, the letter explains that the distribution is Plaintiff's *pro rata* share of additional assets that could not be valued when Plaintiff

---

[47] Oral Arg. Ex. A (email from investorservices@mgstover.com to harrygreenhouse@gmail.com, dated Jan. 30, 2019, re: Polychain Fund I, LP—Distribution Letter; letter from Polychain Capital to Former Investor, dated Jan. 30, 2019).

[48] Oral Arg. Ex. B (Chase checking account "credit transactions" indicating incoming wire transfer on February 20, 2019 for $4,479.33); *see also* Tr. 24 (Plaintiff's counsel pointing out that the description of the wire transfer refers to "BK OBI=SIDE POCKET REDEMPTION").

withdrew from the fund but could be valued as of January 30, 2019.[49]   This "*pro rata*" share has not fluctuated with the value of the Fund as have the equity interests of Polychain's remaining limited partners since Plaintiff's withdrawal.[50]   Had the fund declined in value in the wake of his withdrawal, Plaintiff would readily distinguish himself from those limited partners saddled with cheaper assets and argue that his status as a fully redeemed partner requires that the Fund pay out the balance owed to him based on a valuation as of the date of his withdrawal.[51]   At best, the January 30, 2019, distribution suggests Plaintiff was invested in side pockets during his time as a limited partner, a fact that may be relevant to valuing his redemption but does nothing to support his claim of ongoing equity interest.

The 5% audit holdback likewise is not evidence of an ongoing equity interest. As with the cash distribution, the audit holdback does not rise and fall with the value of the Fund.  Moreover, Section 8.04 of the LPA makes clear that the purpose of the audit holdback is to cover any downward audit adjustment to the partnership's net asset value, thereby ensuring that the redeemed partner's redemption is consistent with the Fund's audited net asset value.  According to the LPA, any unapplied

---

[49] Oral Arg. Ex. A.

[50] *Id.*

[51] *See, e.g.*, *Schuss*, 2008 WL 2433842, at *1 (addressing former limited partners' breach of contract action after decline in value of designated securities by the time of the distribution).

portion of the audit holdback must be returned to the redeemed partner within the 30 days of the end-of-year audit.[52]  And that is precisely what happened; Plaintiff received the entirety of the holdback within 30 days of the completion of the Fund's 2017 annual audit.[53]  Nothing about that holdback resembles equity and, therefore, Polychain's decision to exercise its holdback right did not somehow extend Plaintiff's status as a limited partner.

## III.  CONCLUSION

For the foregoing reasons, Defendants' motion for judgment on the pleadings must be **GRANTED**.

**IT IS SO ORDERED.**

---

[52] LPA § 8.04.

[53] Tr. 21–22. Plaintiff argues that he must have remained a limited partner after Polychain exercised its right to withhold part of his redemption under the LPA because, otherwise, he would have no right to require Polychain to comply with its obligation to return unused funds and otherwise comply with the LPA.  This argument ignores that, by statute, redeemed partners continue to have rights to enforce certain provisions of the LPA as creditors.  *See* 6 *Del. C.* § 17-606.